CLAUS H. HENNINGSEN AND HELEN HENNINGSEN, PLAINTIFFS-RESPONDENTS AND CROSS-APPELLANTS, v. BLOOMFIELD MOTORS, INC., AND CHRYSLER CORPORATION, DEFENDANTS-APPELLANTS AND CROSS-RESPONDENTS.

Argued December 7, 1959—Decided May 9, 1960.

*Mr. Bernard Chazen* argued the cause for plaintiffs (*Mr. Carmen C. Rusignola,* attorney; *Messrs. Baker, Garber & Chazen,* of counsel; *Mr. Martin Itzikman,* on the brief).

*Mr. Samuel Weitzman* argued the cause for defendant Bloomfield Motors, Inc. (*Messrs. Parsonnet, Weitzman & Oransky,* attorneys).

*Mr. Sidney M. Schreiber* argued the cause for defendant Chrysler Corporation (*Messrs. Schreiber, Lancaster & Demos,* attorneys; *Mr. Roger F. Lancaster,* of counsel).

The opinion of the court was delivered by

FRANCIS, J. Plaintiff Claus H. Henningsen purchased a Plymouth automobile, manufactured by defendant Chrysler Corporation, from defendant Bloomfield Motors, Inc. His wife, plaintiff Helen Henningsen, was injured while driving it and instituted suit against both defendants to recover damages on account of her injuries. Her husband joined in the action seeking compensation for his consequential

losses. The complaint was predicated upon breach of express and implied warranties and upon negligence. At the trial the negligence counts were dismissed by the court and the cause was submitted to the jury for determination solely on the issues of implied warranty of merchantability. Verdicts were returned against both defendants and in favor of the plaintiffs. Defendants appealed and plaintiffs cross-appealed from the dismissal of their negligence claim. The matter was certified by this court prior to consideration in the Appellate Division.

The facts are not complicated, but a general outline of them is necessary to an understanding of the case.

On May 7, 1955 Mr. and Mrs. Henningsen visited the place of business of Bloomfield Motors, Inc., an authorized De Soto and Plymouth dealer, to look at a Plymouth. They wanted to buy a car and were considering a Ford or a Chevrolet as well as a Plymouth. They were shown a Plymouth which appealed to them and the purchase followed. The record indicates that Mr. Henningsen intended the car as a Mother's Day gift to his wife. He said the intention was communicated to the dealer. When the purchase order or contract was prepared and presented, the husband executed it alone. His wife did not join as a party.

The purchase order was a printed form of one page. On the front it contained blanks to be filled in with a description of the automobile to be sold, the various accessories to be included, and the details of the financing. The particular car selected, was described as a 1955 Plymouth, Plaza "6," Club Sedan. The type used in the printed parts of the form became smaller in size, different in style, and less readable toward the bottom where the line for the purchaser's signature was placed. The smallest type on the page appears in the two paragraphs, one of two and one-quarter lines and the second of one and one-half lines, on which great stress is laid by the defense in the case. These two paragraphs are the least legible and the most difficult to read in the instrument, but they are most important in

the evaluation of the rights of the contesting parties. They do not attract attention and there is nothing about the format which would draw the reader's eye to them. In fact, a studied and concentrated effort would have to be made to read them. De-emphasis seems the motif rather than emphasis. More particularly, most of the printing in the body of the order appears to be 12 point block type, and easy to read. In the short paragraphs under discussion, however, the type appears to be six point script and the print is solid, that is, the lines are very close together.

The two paragraphs are:

"The front and back of this Order comprise the entire agreement affecting this purchase and no other agreement or understanding of any nature concerning same has been made or entered into, or will be recognized. I hereby certify that no credit has been extended to me for the purchase of this motor vehicle except as appears in writing on the face of this agreement.

I have read the matter printed on the back hereof and agree to it as a part of this order the same as if it were printed above my signature. I certify that I am 21 years of age, or older, and hereby acknowledge receipt of a copy of this order."

On the right side of the form, immediately below these clauses and immediately above the signature line, and in 12 point block type, the following appears:

"CASH OR CERTIFIED CHECK ONLY ON DELIVERY."

On the left side, just opposite and in the same style type as the two quoted clauses, but in eight point size, this statement is set out:

"This agreement shall not become binding upon the Dealer until approved by an officer of the company."

The two latter statements are in the interest of the dealer and obviously an effort is made to draw attention to them.

The testimony of Claus Henningsen justifies the conclusion that he did not read the two fine print paragraphs re-

ferring to the back of the purchase contract. And it is uncontradicted that no one made any reference to them, or called them to his attention. With respect to the matter appearing on the back, it is likewise uncontradicted that he did not read it and that no one called it to his attention.

The reverse side of the contract contains 8½ inches of fine print. It is not as small, however, as the two critical paragraphs described above. The page is headed "Conditions" and contains ten separate paragraphs consisting of 65 lines in all. The paragraphs do not have headnotes or margin notes denoting their particular subject, as in the case of the "Owner Service Certificate" to be referred to later. In the seventh paragraph, about two-thirds of the way down the page, the warranty, which is the focal point of the case, is set forth. It is as follows:

"7. It is expressly agreed that there are no warranties, express or implied, *made* by either the dealer or the manufacturer on the motor vehicle, chassis, or parts furnished hereunder except as follows:

'The manufacturer warrants each new motor vehicle (including original equipment placed thereon by the manufacturer except tires), chassis or parts manufactured by it to be free from defects in material or workmanship under normal use and service. Its obligation under this warranty being limited to making good at its factory any part or parts thereof which shall, within ninety (90) days after delivery of such vehicle *to the original purchaser* or before such vehicle has been driven 4,000 miles, whichever event shall first occur, be returned to it with transportation charges prepaid and which its examination shall disclose to its satisfaction to have been thus defective; *this warranty being expressly in lieu of all other warranties expressed or implied, and all other obligations or liabilities on its part*, and it neither assumes nor authorizes any other person to assume for it any other liability in connection with the sale of its vehicles. \* \* \*.' " (Emphasis ours)

After the contract had been executed, plaintiffs were told the car had to be serviced and that it would be ready in two days. According to the dealer's president, a number of cars were on hand at the time; they had come in from the factory about three or four weeks earlier and at least

some of them, including the one selected by the Henningsens, were kept in the back of the shop for display purposes. When sold, plaintiffs' vehicle was not "a serviced car, ready to go." The testimony shows that Chrysler Corporation sends from the factory to the dealer a "New Car Preparation Service Guide" with each new automobile. The guide contains detailed instructions as to what has to be done to prepare the car for delivery. The dealer is told to "Use this form as a guide to inspect and prepare this new Plymouth for delivery." It specifies 66 separate items to be checked, tested, tightened or adjusted in the course of the servicing, but dismantling the vehicle or checking all of its internal parts is not prescribed. The guide also calls for delivery of the Owner Service Certificate with the car.

This Certificate, which at least by inference is authorized by Chrysler, was in the car when released to Claus Henningsen on May 9, 1955. It was not made part of the purchase contract, nor was it shown to him prior to the consummation of that agreement. The only reference to it therein is that the dealer "agrees to promptly perform and fulfill all terms and conditions of the owner service policy." The Certificate contains a warranty entitled "Automobile Manufacturers Association Uniform Warranty." The provisions thereof are the same as those set forth on the reverse side of the purchase order, except that an additional paragraph is added by which the dealer extends that warranty to the purchaser in the same manner as if the word "Dealer" appeared instead of the word "Manufacturer."

The new Plymouth was turned over to the Henningsens on May 9, 1955. No proof was adduced by the dealer to show precisely what was done in the way of mechanical or road testing beyond testimony that the manufacturer's instructions were probably followed. Mr. Henningsen drove it from the dealer's place of business in Bloomfield to their home in Keansburg. On the trip nothing unusual appeared in the way in which it operated. Thereafter, it was used for short trips on paved streets about the town. It had

no servicing and no mishaps of any kind before the event of May 19. That day, Mrs. Henningsen drove to Asbury Park. On the way down and in returning the car performed in normal fashion until the accident occurred. She was proceeding north on Route 36 in Highlands, New Jersey, at 20–22 miles per hour. The highway was paved and smooth, and contained two lanes for northbound travel. She was riding in the right-hand lane. Suddenly she heard a loud noise "from the bottom, by the hood." It "felt as if something cracked." The steering wheel spun in her hands; the car veered sharply to the right and crashed into a highway sign and a brick wall. No other vehicle was in any way involved. A bus operator driving in the left-hand lane testified that he observed plaintiffs' car approaching in normal fashion in the opposite direction; "all of a sudden [it] veered at 90 degrees * * * and right into this wall." As a result of the impact, the front of the car was so badly damaged that it was impossible to determine if any of the parts of the steering wheel mechanism or workmanship or assembly were defective or improper prior to the accident. The condition was such that the collision insurance carrier, after inspection, declared the vehicle a total loss. It had 468 miles on the speedometer at the time.

The insurance carrier's inspector and appraiser of damaged cars, with 11 years of experience, advanced the opinion, based on the history and his examination, that something definitely went "wrong from the steering wheel down to the front wheels" and that the untoward happening must have been due to mechanical defect or failure; "something down there had to drop off or break loose to cause the car" to act in the manner described.

As has been indicated, the trial court felt that the proof was not sufficient to make out a *prima facie* case as to the negligence of either the manufacturer or the dealer. The case was given to the jury, therefore, solely on the warranty theory, with results favorable to the plaintiffs against both defendants.

I.

## THE CLAIM OF IMPLIED WARRANTY AGAINST THE MANUFACTURER.

 In the ordinary case of sale of goods by description an implied warranty of merchantability is an integral part of the transaction. *R. S.* 46:30–20. If the buyer, expressly or by implication, makes known to the seller the particular purpose for which the article is required and it appears that he has relied on the seller's skill or judgment, an implied warranty arises of reasonable fitness for that purpose. *R. S.* 46:30–21(1). The former type of warranty simply means that the thing sold is reasonably fit for the general purpose for which it is manufactured and sold. *Giant Mfg. Co. v. Yates-American Mach. Co.*, 111 *F. 2d* 360 (8 *Cir.* 1940); *Dunbar Bros. Co. v. Consolidated Iron-Steel Mfg. Co.*, 23 *F. 2d* 416, 419 (2 *Cir.* 1928); *Simmons v. Rhodes & Jamieson, Ltd.*, 46 *Cal. 2d* 190, 293 *P. 2d* 26 (*Sup. Ct.* 1956); *Mead v. Coca Cola Bottling Co.*, 329 *Mass.* 440, 108 *N. E. 2d* 757 (*Sup. Jud. Ct.* 1952); *Ryan v. Progressive Grocery Stores*, 255 *N. Y.* 388, 175 *N. E.* 105, 74 *A. L. R.* 339 (*Ct. App.* 1931); 1 *Williston on Sales*, § 243 (*Rev. ed.* 1948). As Judge (later Justice) Cardozo remarked in *Ryan, supra,* the distinction between a warranty of fitness for a particular purpose and of merchantability in many instances is practically meaningless. In the particular case he was concerned with food for human consumption in a sealed container. Perhaps no more apt illustration of the notion can be thought of than the instance of the ordinary purchaser who informs the automobile dealer that he desires a car for the purpose of business and pleasure driving on the public highway.

 In this connection, it is appropriate to note that sale of an article by a trade name does not negate the warranty of merchantability. *Adams v. Peter Tramontin Motor Sales*, 42 *N. J. Super.* 313 (*App. Div.* 1956); *Ryan v. Progressive*

*Grocery Stores, supra; Frigidinners, Inc. v. Branchtown Gun Club,* 176 *Pa. Super.* 643, 109 *A.* 2d 202 (*Super. Ct.* 1954); 2 *Harper & James, Law of Torts,* § 28.20, *p.* 1082 (1956). An informative statement of the rule (said to be supported by overwhelming authority) was made by the Supreme Court of Pennsylvania in *Frantz Equipment Co. v. Leo Butler Co.,* 370 *Pa.* 459, 88 *A.* 2d 702, 706 (*Sup. Ct.* 1952):

"It is perfectly clear, then, that even if the sale be under a trade name there is implied an obligation on the part of the seller that the article delivered will be of the same quality, material, workmanship, and availability for use as articles generally sold under such name. It would be wholly unreasonable to hold that, if one were to purchase, for example, an automobile under the trade name of 'Ford' or 'Buick' or 'Cadillac' or the like, no implied warranty of merchantable quality could be asserted by the purchaser even though the particular car delivered was in such bad condition, so gravely defective in materials and construction, that it could not be operated at all and was wholly useless for the ordinary purpose which an automobile is designed to serve."

■■ Of course such sales, whether oral or written, may be accompanied by an express warranty. Under the broad terms of the Uniform Sale of Goods Law any affirmation of fact relating to the goods is an express warranty if the natural tendency of the statement is to induce the buyer to make the purchase. *R. S.* 46:30–18. And over the years since the almost universal adoption of the act, a growing awareness of the tremendous development of modern business methods has prompted the courts to administer that provision with a liberal hand. *Vold, Law of Sales,* § 86, *p.* 429 (2d ed. 1959). Solicitude toward the buyer plainly harmonizes with the intention of the Legislature. That fact is manifested further by the later section of the act which preserves and continues any permissible implied warranty, despite an express warranty, unless the two are inconsistent. *R. S.* 46:30–21(6).

■■ The uniform act codified, extended and liberalized the common law of sales. The motivation in part was to

ameliorate the harsh doctrine of *caveat emptor,* and in some measure to impose a reciprocal obligation on the seller to beware. The transcendent value of the legislation, particularly with respect to implied warranties, rests in the fact that obligations on the part of the seller were imposed by operation of law, and did not depend for their existence upon express agreement of the parties. And of tremendous significance in a rapidly expanding commercial society was the recognition of the right to recover damages on account of personal injuries arising from a breach of warranty. *R. S.* 46:30–75, 76; *Simon v. Graham Bakery,* 31 *N. J. Super.* 117 (*App. Div.* 1954), reversed on other grounds 17 *N. J.* 525 (1955); *Marko v. Sears, Roebuck and Co.,* 24 *N. J. Super.* 295, 303 (*App. Div.* 1953); *Ryan v. Progressive Grocery Stores, supra; Stonebrink v. Highland Motors,* 171 *Or.* 415, 137 *P. 2d* 986 (*Sup. Ct.* 1953); *Wells v. Oldsmobile Co.,* 147 *Or.* 687, 35 *P. 2d* 232 (*Sup. Ct.* 1934); *Ebbert v. Philadelphia Electric Co.,* 126 *Pa. Super.* 351, 191 *A.* 384 (*Super. Ct.* 1937), affirmed 330 *Pa.* 257, 198 *A.* 323 (*Sup. Ct.* 1938); 77 *C. J. S., Sales,* § 383; *Prosser, Law of Torts, p.* 493 (1955). The particular importance of this advance resides in the fact that under such circumstances strict liability is imposed upon the maker or seller of the product. Recovery of damages does not depend upon proof of negligence or knowledge of the defect. *Simon v. Graham Bakery, supra; Tomlinson v. Armour & Co.,* 75 *N. J. L.* 748, 754 (*E. & A.* 1907); *Frank R. Jelleff, Inc. v. Braden,* 98 *U. S. App. D. C.* 180, 233 *F. 2d* 671, 63 *A. L. R. 2d* 400 (*D. C. App.* 1956); 2 *Harper & James, supra,* § 28.15; *Prosser, supra,* 494, 506, 523.

As the Sales Act and its liberal interpretation by the courts threw this protective cloak about the buyer, the decisions in various jurisdictions revealed beyond doubt that many manufacturers took steps to avoid these ever increasing warranty obligations. Realizing that the act governed the relationship of buyer and seller, they undertook to withdraw from actual and direct contractual contact with the

buyer. They ceased selling products to the consuming public through their own employees and making contracts of sale in their own names. Instead, a system of independent dealers was established; their products were sold to dealers who in turn dealt with the buying public, ostensibly solely in their own personal capacity as sellers. In the past in many instances, manufacturers were able to transfer to the dealers burdens imposed by the act and thus achieved a large measure of immunity for themselves. But, as will be noted in more detail hereafter, such marketing practices, coupled with the advent of large scale advertising by manufacturers to promote the purchase of these goods from dealers by members of the public, provided a basis upon which the existence of express or implied warranties was predicated, even though the manufacturer was not a party to the contract of sale.

The general observations that have been made are important largely for purposes of perspective. They are helpful in achieving a point from which to evaluate the situation now presented for solution. Primarily, they reveal a trend and a design in legislative and judicial thinking toward providing protection for the buyer. It must be noted, however, that the sections of the Sales Act, to which reference has been made, do not impose warranties in terms of unalterable absolutes. *R. S.* 46:30–3 provides in general terms that an applicable warranty may be negatived or varied by express agreement. As to disclaimers or limitations of the obligations that normally attend a sale, it seems sufficient at this juncture to say they are not favored, and that they are strictly construed against the seller. 2 *Harper & James, supra,* § 28.25; *Vold, supra, p.* 459; *"Warranties of Kind & Quality,"* 57 *Yale L. J.* 1388, 1400–1401 (1948).

With these considerations in mind, we come to a study of the express warranty on the reverse side of the purchase order signed by Claus Henningsen. At the outset we take notice that it was made only by the manufacturer and that by its terms it runs directly to Claus Henningsen.

On the facts detailed above, it was to be extended to him by the dealer as the agent of Chrysler Corporation. The consideration for this warranty is the purchase of the manufacturer's product from the dealer by the ultimate buyer. *Studebaker Corp. v. Nail,* 82 *Ga. App.* 779, 62 *S. E. 2d* 198 (*Ct. App.* 1950).

Although the franchise agreement between the defendants recites that the relationship of principal and agent is not created, in particular transactions involving third persons the law will look at their conduct and not to their intent or their words as between themselves but to their factual relation. *Restatement (Second), Agency* § 27 (1958). The normal pattern that the manufacturer-dealer relationship follows relegates the position of the dealer to the status of a way station along the car's route from maker to consumer. This is indicated by the language of the warranty. Obviously the parties knew and so intended that the dealer would not use the automobile for 90 days or drive it 4,000 miles. And the words "original purchaser," taken in their context, signify the purchasing member of the public. *Columbia Motors Co. v. Williams,* 209 *Ala.* 640, 96 *So.* 900 (*Sup. Ct.* 1923); *Miller Rubber Co. v. Blewster-Stephens Service Station,* 171 *Ark.* 1179, 287 *S. W.* 577, 59 *A. L. R.* 1237 (*Sup. Ct.* 1926). Moreover, the language of this warranty is that of the uniform warranty of the Automobile Manufacturers Association, of which Chrysler is a member. See *Automotive Facts & Figures,* 1958 *Edition,* published by Automotive Manufacturers Association, *p.* 69; *Automotive News* 1959 *Almanac* (Slocum Publishing Co., Inc., Detroit) *p.* 25. And it is the form appearing in the Plymouth Owner Service Certificate mentioned in the servicing instruction guide sent with the new car from the factory. The evidence is overwhelming that the dealer acted for Chrysler in including the warranty in the purchase contract. And see, *Studebaker Corp. v. Nail, supra; Advance Rumley Thresher Co. v. Briggs Hardware Co.,* 202 *Mo. App.* 603, 206 *S. W.* 587 (*Ct. App.* 1918); *New Way Motor*

Co. v. Farmers' Electro-Lighting Co., 48 S. D. 4, 201 N. W. 1000 (Sup. Ct. 1925); Pelletier v. Brown Bros. Chevrolet & Oldsmobile, 164 N. Y. S. 2d 249 (Sup. Ct. 1956); Fetzer v. Haralson, 147 S. W. 290 (Tex. Civ. App. 1912); cf. General Motors Corporation v. Dodson, —— Tenn. ——, —— S. W. 2d —— (Jan. 15, 1960).

The terms of the warranty are a sad commentary upon the automobile manufacturers' marketing practices. Warranties developed in the law in the interest of and to protect the ordinary consumer who cannot be expected to have the knowledge or capacity or even the opportunity to make adequate inspection of mechanical instrumentalities, like automobiles, and to decide for himself whether they are reasonably fit for the designed purpose. Greenland Develop. Corp. v. Allied Heat. Prod. Co., 184 Va. 588, 35 S. E. 2d 801, 164 A. L. R. 1312 (Sup. Ct. App. 1945); 1 Williston, supra, pp. 625, 626. But the ingenuity of the Automobile Manufacturers Association, by means of its standardized form, has metamorphosed the warranty into a device to limit the maker's liability. To call it an "equivocal" agreement, as the Minnesota Supreme Court did, is the least that can be said in criticism of it. Federal Motor Truck Sales Corporation v. Shanus, 190 Minn. 5, 250 N. W. 713, 714 (Sup. Ct. 1933).

The manufacturer agrees to replace defective parts for 90 days after the sale or until the car has been driven 4,000 miles, whichever is first to occur, if the part is sent to the factory, transportation charges prepaid, and if examination discloses to its satisfaction that the part is defective. It is difficult to imagine a greater burden on the consumer, or less satisfactory remedy. Aside from imposing on the buyer the trouble of removing and shipping the part, the maker has sought to retain the uncontrolled discretion to decide the issue of defectiveness. Some courts have removed much of the force of that reservation by declaring that the purchaser is not bound by the manufacturer's decision. Mills v. Maxwell Motor Sales Corporation, 105 Neb. 465, 181 N. W.

152, 22 *A. L. R.* 130 (*Sup. Ct.* 1920); *Cannon v. Pulliam Motor Company,* 230 *S. C.* 131, 94 *S. E. 2d* 397 (*Sup. Ct.* 1956). In the *Mills* case, the court said:

"It would nevertheless be repugnant to every conception of justice to hold that, if the parts thus returned for examination were, in point of fact, so defective as to constitute a breach of warranty, the appellee's right of action could be defeated by the appellant's arbitrary refusal to recognize that fact. Such an interpretation would substitute the appellant for the courts in passing upon the question of fact, and would be unreasonable." *Supra,* 181 *N. W.,* at *page* 154.

Also suppose, as in this case, a defective part or parts caused an accident and that the car was so damaged as to render it impossible to discover the precise part or parts responsible, although the circumstances clearly pointed to such fact as the cause of the mishap. Can it be said that the impossibility of performance deprived the buyer of the benefit of the warranty?

Moreover, the guaranty is against defective workmanship. That condition may arise from good parts improperly assembled. There being no defective parts to return to the maker, is all remedy to be denied? One court met that type of problem by holding that where the purchaser does not know the precise cause of inoperability, calling a car a "vibrator" would be sufficient to state a claim for relief. It said that such a car is not an uncommon one in the industry. The general cause of the vibration is not known. Some part or parts have been either defectively manufactured or improperly assembled in the construction and manufacture of the automobile. In the operation of the car, these parts give rise to vibrations. The difficulty lies in locating the precise spot and cause. *Allen v. Brown,* 181 *Kan.* 301, 310 *P. 2d* 923 (*Sup. Ct.* 1957). But the warranty does not specify what the purchaser must do to obtain relief in such case, if a remedy is intended to be provided. Must the purchaser return the car, transportation charges prepaid, over a great distance to the factory? It may be said that in the usual

case the dealer also gives the same warranty and that as a matter of expediency the purchaser should turn to him. But under the law the buyer is entitled to proceed against the manufacturer. Further, dealers' franchises are precarious (see, *Automobile Franchise Agreements, Hewitt* (1956)). For example, Bloomfield Motors' franchise may be cancelled by Chrysler on 90 days' notice. And obviously dealers' facilities and capacity, financial and otherwise, are not as sufficient as those of the primarily responsible manufacturer in his distant factory.

The matters referred to represent only a small part of the illusory character of the security presented by the warranty. Thus far the analysis has dealt only with the remedy provided in the case of a defective part. What relief is provided when the breach of the warranty results in personal injury to the buyer? (Injury to third persons using the car in the purchaser's right will be treated hereafter.) As we have said above, the law is clear that such damages are recoverable under an ordinary warranty. The right exists whether the warranty sued on is express or implied. See, *e. g., Ryan v. Progressive Grocery Stores, supra.* And, of course, it has long since been settled that where the buyer or a member of his family driving with his permission suffers injuries because of negligent manufacture or construction of the vehicle, the manufacturer's liability exists. *Prosser, supra,* §§ 83, 84. But in this instance, after reciting that defective parts will be replaced at the factory, the alleged agreement relied upon by Chrysler provides that the manufacturer's "obligation under this warranty" is limited to that undertaking; further, that such remedy is "in lieu of all other warranties, express or implied, and all other obligations or liabilities on its part." The contention has been raised that such language bars any claim for personal injuries which may emanate from a breach of the warranty. Although not urged in this case, it has been successfully maintained that the exclusion "of all other obligations and liabilities on its part" precludes

a cause of action for injuries based on negligence. *Shafer v. Reo Motors*, 205 *F. 2d* 685 (3 *Cir.* 1953). Another Federal Circuit Court of Appeals holds to the contrary. *Doughnut Mach. Corporation v. Bibbey*, 65 *F. 2d* 634 (1 *Cir.* 1933). There can be little doubt that justice is served only by the latter ruling.

Putting aside for the time being the problem of the efficacy of the disclaimer provisions contained in the express warranty, a question of first importance to be decided is whether an implied warranty of merchantability by Chrysler Corporation accompanied the sale of the automobile to Claus Henningsen.

Preliminarily, it may be said that the express warranty against defective parts and workmanship is not inconsistent with an implied warranty of merchantability. Such warranty cannot be excluded for that reason. *Knapp v. Willys-Ardmore, Inc.*, 174 *Pa. Super.* 90, 100 *A. 2d* 105 (1953). And see, *Hambrick v. Peoples Mercantile & Implement Co.*, 228 *Ark.* 1021, 311 *S. W. 2d* 785 (*Sup. Ct.* 1958); *Hardy v. General Motors Acceptance Corporation*, 38 *Ga. App.* 463, 144 *S. E.* 327 (*Ct. App.* 1928); *Bekkevold v. Potts*, 173 *Minn.* 87, 216 *N. W.* 790, 59 *A. L. R.* 1164 (*Sup. Ct.* 1927); *Hooven & Allison Co. v. Wirtz*, 15 *N. D.* 477, 107 *N. W.* 1078 (*Sup. Ct.* 1906); *Frigidinners, Inc. v. Branchtown Gun Club, supra.*

Chrysler points out that an implied warranty of merchantability is an incident of a contract of sale. It concedes, of course, the making of the original sale to Bloomfield Motors, Inc., but maintains that this transaction marked the terminal point of its contractual connection with the car. Then Chrysler urges that since it was not a party to the sale by the dealer to Henningsen, there is no privity of contract between it and the plaintiffs, and the absence of this privity eliminates any such implied warranty.

There is no doubt that under early common-law concepts of contractual liability only those persons who were parties to the bargain could sue for a breach of it. In more recent

times a noticeable disposition has appeared in a number of jurisdictions to break through the narrow barrier of privity when dealing with sales of goods in order to give realistic recognition to a universally accepted fact. The fact is that the dealer and the ordinary buyer do not, and are not expected to, buy goods, whether they be foodstuffs or automobiles, exclusively for their own consumption or use. Makers and manufacturers know this and advertise and market their products on that assumption; witness, the "family" car, the baby foods, *etc.* The limitations of privity in contracts for the sale of goods developed their place in the law when marketing conditions were simple, when maker and buyer frequently met face to face on an equal bargaining plane and when many of the products were relatively uncomplicated and conducive to inspection by a buyer competent to evaluate their quality. See, *Freezer, "Manufacturer's Liability for Injuries Caused by His Products,"* 37 *Mich. L. Rev.* 1 (1938). With the advent of mass marketing, the manufacturer became remote from the purchaser, sales were accomplished through intermediaries, and the demand for the product was created by advertising media. In such an economy it became obvious that the consumer was the person being cultivated. Manifestly, the connotation of "consumer" was broader than that of "buyer." He signified such a person who, in the reasonable contemplation of the parties to the sale, might be expected to use the product. Thus, where the commodities sold are such that if defectively manufactured they will be dangerous to life or limb, then society's interests can only be protected by eliminating the requirement of privity between the maker and his dealers and the reasonably expected ultimate consumer. In that way the burden of losses consequent upon use of defective articles is borne by those who are in a position to either control the danger or make an equitable distribution of the losses when they do occur. As *Harper & James* put it, "The interest in consumer protection calls for warranties by the maker that *do* run with the goods, to reach all who are

likely to be hurt by the use of the unfit commodity for a purpose ordinarily to be expected." *2 Harper & James, supra,* 1571, 1572; also see, 1535; *Prosser, supra,* 506–511. As far back as 1932, in the well known case of *Baxter v. Ford Motor Co.,* 168 *Wash.* 456, 12 *P. 2d* 409 (*Sup. Ct.* 1932), affirmed 15 *P. 2d* 1118, 88 *A. L. R.* 521 (*Sup. Ct.* 1932), the Supreme Court of Washington gave recognition to the impact of then existing commercial practices on the strait jacket of privity, saying:

> "It would be unjust to recognize a rule that would permit manufacturers of goods to create a demand for their products by representing that they possess qualities which they, in fact, do not possess, and then, because there is no privity of contract existing between the consumer and the manufacturer, deny the consumer the right to recover if damages result from the absence of those qualities, when such absence is not readily noticeable." 12 *P. 2d,* at *page* 412.

The concept was expressed in a practical way by the Supreme Court of Texas in *Jacob E. Decker & Sons, Inc. v. Capps,* 139 *Tex.* 609, 164 *S. W. 2d* 828, 833, 142 *A. L. R.* 1479 (1942):

> "In fact, the manufacturer's interest in the product is not terminated when he has sold it to the wholesaler. He must get it off the wholesaler's shelves before the wholesaler will buy a new supply. The same is not only true of the retailer, but of the house wife, for the house wife will not buy more until the family has consumed that which she has in her pantry. Thus the manufacturer or other vendor intends that this appearance of suitability of the article for human consumption should continue and be effective until some one is induced thereby to consume the goods. It would be but to acknowledge a weakness in the law to say that he could thus create a demand for his products by inducing a belief that they are suitable for human consumption, when, as a matter of fact, they are not, and reap the benefits of the public confidence thus created, and then avoid liability for the injuries caused thereby merely because there was no privity of contract between him and the one whom he induced to consume the food. * * *"

Although only a minority of jurisdictions have thus far departed from the requirement of privity, the movement in that direction is most certainly gathering momentum. Lia-

bility to the ultimate consumer in the absence of direct contractual connection has been predicated upon a variety of theories. Some courts hold that the warranty runs with the article like a covenant running with land; others recognize a third-party beneficiary thesis; still others rest their decision on the ground that public policy requires recognition of a warranty made directly to the consumer. *Welter v. Bowman Dairy Co.*, 318 *Ill. App.* 305, 47 *N. E.* 2d 739 (*App. Ct.* 1943); *Bahlman v. Hudson Motor Car Co.*, 290 *Mich.* 683, 288 *N. W.* 309 (*Sup. Ct.* 1939); *Worley v. Procter & Gamble Mfg. Co.*, 241 *Mo. App.* 1114, 253 *S. W.* 2d 532 (*Ct. App.* 1953); *Markovich v. McKesson and Robbins, Inc.*, 106 *Ohio App.* 265, 149 *N. E.* 2d 181 (*Ct. App.* 1958); 2 *Harper & James, supra,* 1573; *Prosser, supra,* 507; *Jeanblanc, "Manufacturers' Liability to Persons other than their Immediate Vendees,"* 24 *Va. L. Rev.* 134, 156 (1937).

Further reference to *Decker, supra,* is enlightening:

"There certainly is justification for indulging a presumption of a warranty that runs with the article in the sale of food products. A party who processes a product and gives it the appearance of being suitable for human consumption, and places it in the channels of commerce, expects some one to consume the food in reliance on its appearance that it is suitable for human consumption. He expects the appearance of suitableness to continue with the product until some one is induced to consume it as food. But a modern manufacturer or vendor does even more than this under modern practices. He not only processes the food and dresses it up so as to make it appear appetizing, but he uses the newspapers, magazines, billboards, and the radio to build up the psychology to buy and consume his products. The invitation extended by him is not only to the house wife to buy and serve his product, but to the members of the family and guest to eat it. * * * The mere fact that a manufacturer or other vendor may thus induce the public to consume unwholesome food evidences the soundness of the rule which imposes a warranty, *as a matter of public policy* on the sale of food or other products intended for human consumption." 164 *S. W.* 2d, at *pages* 832, 833. (Emphasis added)

In *Patargias v. Coca-Cola Bottling Co. of Chicago,* 332 *Ill. App.* 117, 74 *N. E.* 2d 162 (*App. Ct.* 1947), involving the sale of a bottle of coca-cola by a dealer, the court said:

"We are impelled to hold that, where an article of food or drink is sold in a sealed container for human consumption, public policy demands that an implied warranty be imposed upon the manufacturer thereof that such article is wholesome and fit for use, that said warranty *runs with the sale* of the article for the benefit of the consumer thereof * * *." 74 *N. E.* 2d, at *page* 169. (Emphasis added)

And in *Worley v. Procter & Gamble Mfg. Co., supra,* it was said that:

"In the case of food products sold in original packages, and other articles dangerous to life [here a box of soap powder], if defective, the manufacturer, who alone is in a position to inspect and control their preparation, should be held as a warrantor, whether he purveys his products by his own hand, or through a network of independent distributing agencies. In either case, the essence of the situation is the same—the placing of goods in the channels of trade, representations directed to the ultimate consumer, and damaging reliance by the latter on those representations. Such representations, being inducements to the buyers making the purchase, should be regarded as warranties imposed by law, independent of the vendors' contractual intentions. The liability thus imposed springs from representations directed to the ultimate consumer, and not from the breach of any contractual undertaking on the part of the vendor. This is in accord with the original theory of the action * * *." 253 *S. W.* 2d at *page* 537. (Insertion ours)

See to the same effect: *Davis v. Van Camp Packing Co.,* 189 *Iowa* 775, 176 *N. W.* 382, 17 *A. L. R.* 649 (*Sup. Ct.* 1920); *Nichols v. Nold,* 174 *Kan.* 613, 258 *P.* 2d 317, 38 *A. L. R.* 2d 887 (*Sup. Ct.* 1953); *Parks v. G. C. Yost Pie Co.,* 93 *Kan.* 334, 144 *P.* 202, *L. R. A.* 1915C, 179 (*Sup. Ct.* 1914); *Madouros v. Kansas City Coca-Cola Bottling Co.,* 230 *Mo. App.* 275, 90 *S. W.* 2d 445 (*Ct. App.* 1936); *Ward v. Morehead City Sea Food Co.,* 171 *N. C.* 33, 87 *S. E.* 958 (*Sup. Ct.* 1916).

Most of the cases where lack of privity has not been permitted to interfere with recovery have involved food and drugs. *Haut v. Kleene,* 320 *Ill. App.* 273, 50 *N. E.* 2d 855 (*App. Ct.* 1943); *Welter v. Bowman Dairy Co., supra; Davis v. Van Camp Packing Co., supra; Madouros v. Kansas*

City Coca-Cola Bottling Co., supra; Greenberg v. Lorenz, 12 Misc. 2d 883, 178 N. Y. S. 2d 407 (Sup. Ct. 1958); Ryan v. Progressive Grocery Stores, Inc., supra; Jacob E. Decker & Sons, Inc. v. Capps, supra; La Hue v. Coca-Cola Bottling, 50 Wash. 2d 645, 314 P. 2d 421 (Sup. Ct. 1957). In fact, the rule as to such products has been characterized as an exception to the general doctrine. But more recently courts, sensing the inequity of such limitation, have moved into broader fields: home permanent wave set, Markovich v. McKesson and Robbins, Inc., supra; Rogers v. Toni Home Permanent Co., 167 Ohio St. 244, 147 N. E. 2d 612 (Sup. Ct. 1958); soap detergent, Worley v. Procter & Gamble Mfg. Co., supra; inflammable cowboy suit (by clear implication), Blessington v. McCrory Stores Corp., 305 N. Y. 140, 111 N. E. 2d 421, 37 A. L. R. 2d 698 (Ct. App. 1953); exploding bottle, Mahoney v. Shaker Square Beverages, 46 Ohio Op. 250, 102 N. E. 2d 281 (C. P. 1951); defective emery wheel, DiVello v. Gardner Machine Co., 46 Ohio Op. 161, 102 N. E. 2d 289 (C. P. 1951); defective wire rope, Mannsz v. Macwhyte Co., 155 F. 2d 445 (3 Cir. 1946); defective cinder blocks, Spence v. Three Rivers Builders & Masonry Supply, 353 Mich. 120, 90 N. W. 2d 873 (Sup. Ct. 1958).

We see no rational doctrinal basis for differentiating between a fly in a bottle of beverage and a defective automobile. The unwholesome beverage may bring illness to one person, the defective car, with its great potentiality for harm to the driver, occupants, and others, demands even less adherence to the narrow barrier of privity. 2 Harper & James, supra, 1572; 1 Williston, supra, § 244a, p. 648; Note, 46 Harv. L. Rev. 161 (1932). In Mannsz v. Macwhyte Co., supra, Chief Judge Biggs, speaking for the Third Circuit Court of Appeals, said:

"We think it is clear that whether the approach to the problem be by way of warranty or under the doctrine of negligence, the requirement of privity between the injured party and the manu-

facturer of the article which has injured him has been obliterated from the Pennsylvania law. The abolition of the doctrine occurred first in the food cases, next in the beverage decisions and now it has been extended to those cases in which the article manufactured, not dangerous or even beneficial if properly made, injured a person because it was manufactured improperly." 155 *F.* 2d, at *pages* 449–450.

Under modern conditions the ordinary layman, on responding to the importuning of colorful advertising, has neither the opportunity nor the capacity to inspect or to determine the fitness of an automobile for use; he must rely on the manufacturer who has control of its construction, and to some degree on the dealer who, to the limited extent called for by the manufacturer's instructions, inspects and services it before delivery. In such a marketing milieu his remedies and those of persons who properly claim through him should not depend "upon the intricacies of the law of sales. The obligation of the manufacturer should not be based alone on privity of contract. It should rest, as was once said, upon 'the demands of social justice.'" *Mazetti v. Armour & Co.,* 75 *Wash.* 622, 135 *P.* 633, 48 *L. R. A., N. S.,* 213 (*Sup. Ct.* 1913). "If privity of contract is required," then, under the circumstances of modern merchandising, "privity of contract exists in the consciousness and understanding of all right-thinking persons." *Madouros v. Kansas City Coca-Cola Bottling Co., supra,* 90 *S. W.* 2d, at *page* 450.

Accordingly, we hold that under modern marketing conditions, when a manufacturer puts a new automobile in the stream of trade and promotes its purchase by the public, an implied warranty that it is reasonably suitable for use as such accompanies it into the hands of the ultimate purchaser. Absence of agency between the manufacturer and the dealer who makes the ultimate sale is immaterial.

## II.

### THE EFFECT OF THE DISCLAIMER AND LIMITATION OF LIABILITY CLAUSES ON THE IMPLIED WARRANTY OF MERCHANTABILITY.

Judicial notice may be taken of the fact that automobile manufacturers, including Chrysler Corporation, undertake large scale advertising programs over television, radio, in newspapers, magazines and all media of communication in order to persuade the public to buy their products. As has been observed above, a number of jurisdictions, conscious of modern marketing practices, have declared that when a manufacturer engages in advertising in order to bring his goods and their quality to the attention of the public and thus to create consumer demand, the representations made constitute an express warranty running directly to a buyer who purchases in reliance thereon. The fact that the sale is consummated with an independent dealer does not obviate that warranty. *Mannsz v. Macwhyte Co., supra; Bahlman v. Hudson Motor Car Co., supra; Rogers v. Toni Home Permanent Co., supra; Meyer v. Packard Cleveland Motor Co.*, 106 *Ohio St.* 328, 140 *N. E.* 118, 28 *A. L. R.* 986 (1922) ; *Baxter v. Ford Motor Co., supra;* 1 *Williston, Sales, supra,* § 244a.

In view of the cases in various jurisdictions suggesting the conclusion which we have now reached with respect to the implied warranty of merchantability, it becomes apparent that manufacturers who enter into promotional activities to stimulate consumer buying may incur warranty obligations of either or both the express or implied character. These developments in the law inevitably suggest the inference that the form of express warranty made part of the Henningsen purchase contract was devised for general use in the automobile industry as a possible means of avoiding the consequences of the growing judicial acceptance of the thesis that the described express or implied warranties run directly to the consumer.

In the light of these matters, what effect should be given to the express warranty in question which seeks to limit the manufacturer's liability to replacement of defective parts, and which disclaims all other warranties, express or implied? In assessing its significance we must keep in mind the general principle that, in the absence of fraud, one who does not choose to read a contract before signing it, cannot later relieve himself of its burdens. *Fivey v. Pennsylvania R. R. Co.*, 67 *N. J. L.* 627 (*E. & A.* 1902). And in applying that principle, the basic tenet of freedom of competent parties to contract is a factor of importance. But in the framework of modern commercial life and business practices, such rules cannot be applied on a strict, doctrinal basis. The conflicting interests of the buyer and seller must be evaluated realistically and justly, giving due weight to the social policy evinced by the Uniform Sales Act, the progressive decisions of the courts engaged in administering it, the mass production methods of manufacture and distribution to the public, and the bargaining position occupied by the ordinary consumer in such an economy. The history of the law shows that legal doctrines, as first expounded, often prove to be inadequate under the impact of later experience. In such case, the need for justice has stimulated the necessary qualifications or adjustments. *Perkins v. Endicott Johnson Corporation*, 128 *F.* 2d 208, 217 (2 *Cir.* 1942), affirmed 317 *U. S.* 501, 63 *S. Ct.* 339, 87 *L. Ed.* 424 (1943); *Greenberg v. Lorenz, supra.*

In these times, an automobile is almost as much a servant of convenience for the ordinary person as a household utensil. For a multitude of other persons it is a necessity. Crowded highways and filled parking lots are a commonplace of our existence. There is no need to look any farther than the daily newspaper to be convinced that when an automobile is defective, it has great potentiality for harm.

No one spoke more graphically on this subject than Justice Cardozo in the landmark case of *MacPherson v. Buick Motor*

Co., 217 N. Y. 382, 111 N. E. 1050, 1053, L. R. A. 1916 F, 696 (Ct. App. 1916):

"Beyond all question, the nature of an automobile gives warning of probable danger if its construction is defective. This automobile was designed to go 50 miles per hour. Unless its wheels were sound and strong, injury was almost certain. It was as much a thing of danger as a defective engine for a railroad. * * * The dealer was indeed the one person of whom it might be said with some approach to certainty that by him the car would not be used. * * * Precedents drawn from the days of travel by stagecoach do not fit the conditions of travel to-day. The principle that the danger must be imminent does not change, but the things subject to the principle do change. They are whatever the needs of life in a developing civilization require them to be."

In the 44 years that have intervened since that utterance, the average car has been constructed for almost double the speed mentioned; 60 miles per hour is permitted on our parkways. The number of automobiles in use has multiplied many times and the hazard to the user and the public has increased proportionately. The Legislature has intervened in the public interest, not only to regulate the manner of operation on the highway but also to require periodic inspection of motor vehicles and to impose a duty on manufacturers to adopt certain safety devices and methods in their construction. R. S. 39:3–43 et seq. It is apparent that the public has an interest not only in the safe manufacture of automobiles, but also, as shown by the Sales Act, in protecting the rights and remedies of purchasers, so far as it can be accomplished consistently with our system of free enterprise. In a society such as ours, where the automobile is a common and necessary adjunct of daily life, and where its use is so fraught with danger to the driver, passengers and the public, the manufacturer is under a special obligation in connection with the construction, promotion and sale of his cars. Consequently, the courts must examine purchase agreements closely to see if consumer and public interests are treated fairly.

What influence should these circumstances have on the restrictive effect of Chrysler's express warranty in the framework of the purchase contract? As we have said, warranties originated in the law to safeguard the buyer and not to limit the liability of the seller or manufacturer. It seems obvious in this instance that the motive was to avoid the warranty obligations which are normally incidental to such sales. The language gave little and withdrew much. In return for the delusive remedy of replacement of defective parts at the factory, the buyer is said to have accepted the exclusion of the maker's liability for personal injuries arising from the breach of the warranty, and to have agreed to the elimination of any other express or implied warranty. An instinctively felt sense of justice cries out against such a sharp bargain. But does the doctrine that a person is bound by his signed agreement, in the absence of fraud, stand in the way of any relief?

In the modern consideration of problems such as this, Corbin suggests that practically all judges are "chancellors" and cannot fail to be influenced by any equitable doctrines that are available. And he opines that "there is sufficient flexibility in the concepts of fraud, duress, misrepresentation and undue influence, not to mention differences in economic bargaining power" to enable the courts to avoid enforcement of unconscionable provisions in long printed standardized contracts. 1 *Corbin on Contracts* (1950) § 128, *p.* 188. Freedom of contract is not such an immutable doctrine as to admit of no qualification in the area in which we are concerned. As Chief Justice Hughes said in his dissent in *Morehead v. People of State of New York ex rel. Tipaldo,* 298 *U. S.* 587, 627, 56 *S. Ct.* 918, 80 *L. Ed.* 1347, 1364 (1936):

"We have had frequent occasion to consider the limitations on liberty of contract. While it is highly important to preserve that liberty from arbitrary and capricious interference, it is also necessary to prevent its abuse, as otherwise it could be used to override all public interests and thus in the end destroy the very freedom of opportunity which it is designed to safeguard."

That sentiment was echoed by Justice Frankfurter in his dissent in *United States v. Bethlehem Steel Corp.*, 315 *U. S.* 289, 326, 62 *S. Ct.* 581, 86 *L. Ed.* 855, 876 (1942):

"It is said that familiar principles would be outraged if Bethlehem were denied recovery on these contracts. But is there any principle which is more familiar or more firmly embedded in the history of Anglo-American law than the basic doctrine that the courts will not permit themselves to be used as instruments of inequity and injustice? Does any principle in our law have more universal application than the doctrine that courts will not enforce transactions in which the relative positions of the parties are such that one has unconscionably taken advantage of the necessities of the other?

These principles are not foreign to the law of contracts. Fraud and physical duress are not the only grounds upon which courts refuse to enforce contracts. The law is not so primitive that it sanctions every injustice except brute force and downright fraud. More specifically, the courts generally refuse to lend themselves to the enforcement of a 'bargain' in which one party has unjustly taken advantage of the economic necessities of the other. \* \* \*"

The traditional contract is the result of free bargaining of parties who are brought together by the play of the market, and who meet each other on a footing of approximate economic equality. In such a society there is no danger that freedom of contract will be a threat to the social order as a whole. But in present-day commercial life the standardized mass contract has appeared. It is used primarily by enterprises with strong bargaining power and position. "The weaker party, in need of the goods or services, is frequently not in a position to shop around for better terms, either because the author of the standard contract has a monopoly (natural or artificial) or because all competitors use the same clauses. His contractual intention is but a subjection more or less voluntary to terms dictated by the stronger party, terms whose consequences are often understood in a vague way, if at all." *Kessler, "Contracts of Adhesion—Some Thoughts About Freedom of Contract,"* 43 *Colum. L. Rev.* 629, 632 (1943); *Ehrenzweig, "Adhesion Contracts in the Conflict of Laws,"* 53 *Colum. L. Rev.* 1072, 1075, 1089 (1953). Such standardized contracts have been

described as those in which one predominant party will dictate its law to an undetermined multiple rather than to an individual. They are said to resemble a law rather than a meeting of the minds. *Siegelman v. Cunard White Star,* 221 *F. 2d* 189, 206 (2 *Cir.* 1955).

Vold, in the recent revision of his *Law of Sales* (*2d ed.* 1959), at *page* 447, wrote of this type of contract and its effect upon the ordinary buyer:

"In recent times the marketing process has been getting more highly organized than ever before. Business units have been expanding on a scale never before known. The standardized contract with its broad disclaimer clauses is drawn by legal advisers of sellers widely organized in trade associations. It is encountered on every hand. Extreme inequality of bargaining between buyer and seller in this respect is now often conspicuous. Many buyers no longer have any real choice in the matter. They must often accept what they can get though accompanied by broad disclaimers. The terms of these disclaimers deprive them of all substantial protection with regard to the quality of the goods. In effect, this is by force of contract between very unequal parties. It throws the risk of defective articles on the most dependent party. He has the least individual power to avoid the presence of defects. He also has the least individual ability to bear their disastrous consequences."

The warranty before us is a standardized form designed for mass use. It is imposed upon the automobile consumer. He takes it or leaves it, and he must take it to buy an automobile. No bargaining is engaged in with respect to it. In fact, the dealer through whom it comes to the buyer is without authority to alter it; his function is ministerial—simply to deliver it. The form warranty is not only standard with Chrysler but, as mentioned above, it is the uniform warranty of the Automobile Manufacturers Association. Members of the Association are: General Motors, Inc., Ford, Chrysler, Studebaker-Packard, American Motors (Rambler), Willys Motors, Checker Motors Corp., and International Harvester Company. *Automobile Facts and Figures* (1958 *Ed.*, Automobile Manufacturers Association) 69. Of these companies, the "Big Three" (General Motors, Ford, and Chrysler) represented 93.5% of the passenger-car production for 1958

and the independents 6.5%. *Standard & Poor* (Industrial Surveys, Autos, Basic Analysis, June 25, 1959) 4109. And for the same year the "Big Three" had 86.72% of the total passenger vehicle registrations. *Automotive News,* 1959 *Almanac* (Slocum Publishing Co., Inc.) *p.* 25.

The gross inequality of bargaining position occupied by the consumer in the automobile industry is thus apparent. There is no competition among the car makers in the area of the express warranty. Where can the buyer go to negotiate for better protection? Such control and limitation of his remedies are inimical to the public welfare and, at the very least, call for great care by the courts to avoid injustice through application of strict common-law principles of freedom of contract. Because there is no competition among the motor vehicle manufacturers with respect to the scope of protection guaranteed to the buyer, there is no incentive on their part to stimulate good will in that field of public relations. Thus, there is lacking a factor existing in more competitive fields, one which tends to guarantee the safe construction of the article sold. Since all competitors operate in the same way, the urge to be careful is not so pressing. See *"Warranties of Kind and Quality,"* 57 *Yale L. J.* 1389, 1400 (1948).

Although the courts, with few exceptions, have been most sensitive to problems presented by contracts resulting from gross disparity in buyer-seller bargaining positions, they have not articulated a general principle condemning, as opposed to public policy, the imposition on the buyer of a skeleton warranty as a means of limiting the responsibility of the manufacturer. They have endeavored thus far to avoid a drastic departure from age-old tenets of freedom of contract by adopting doctrines of strict construction, and notice and knowledgeable assent by the buyer to the attempted exculpation of the seller. 1 *Corbin, supra,* 337; 2 *Harper & James, supra,* 1590; Prosser, *"Warranty of Merchantable Quality,"* 27 *Minn. L. Rev.* 117, 159 (1932). Accordingly to be found in the cases are statements that disclaimers and

the consequent limitation of liability will not be given effect if "unfairly procured," *Davis Motors, Dodge and Plymouth Co. v. Avett,* 294 *S. W. 2d* 882, 887 *(Tex. Civ. App.* 1956); *International Harvester Co. of America v. Bean,* 159 *Ky.* 842, 169 *S. W.* 549 *(Ct. App.* 1914); if not brought to the buyer's attention and he was not made understandingly aware of it, *Vaughan's Seed Store v. Stringfellow,* 56 *Fla.* 708, 48 *So.* 410 *(Sup. Ct.* 1908); *Parsons Band Cutter & Self-Feeder Co. v. Haub,* 83 *Minn.* 180, 86 *N. W.* 14 *(Sup. Ct.* 1901); *Bell v. Mills,* 78 *App. Div.* 42, 80 *N. Y. S.* 34 (1902); *Landreth v. Wyckoff,* 67 *App. Div.* 145, 73 *N. Y. S.* 388 (1901); *St. Louis Cordage Mills v. Western Supply Co.,* 54 *Okl.* 757, 154 *P.* 646 *(Sup. Ct.* 1916); *Reliance Varnish Co. v. Mullins Lumber Co.,* 213 *S. C.* 84, 48 *S. E. 2d* 653 *(Sup. Ct.* 1948); *Stevenson v. B. B. Kirkland Seed Co.,* 176 *S. C.* 345, 180 *S. E.* 197 *(Sup. Ct.* 1935); *Black v. B. B. Kirkland Seed Co.,* 158 *S. C.* 112, 155 *S. E.* 268 *(Sup. Ct.* 1930); or if not clear and explicit, *McPeak v. Boker,* 236 *Minn.* 420, 53 *N. W. 2d* 130 *(Sup. Ct.* 1952).

Some of these cases are worthy of more specific reference. In *Stevenson v. B. B. Kirkland Seed Co., supra* [176 *S. C.* 345, 180 *S. E.* 199], plaintiff asked for Abruzzi rye seed and defendant's agent sold seed to him as such. The invoice contained a non-warranty or disclaimer clause to the effect that no warranty, express or implied, was given by the seller "as to description, quality, productiveness, or any other matter of any seeds, bulbs, or plants," that there would be no responsibility for the crop, and that if the goods were not acceptable they were to be returned at once. The seed was discovered not to be Abruzzi when it had grown sufficiently to be distinguished. In the absence of proof that the disclaimer was actually brought to the attention of the buyer, it was declared not binding.

In *St. Louis Cordage Mills v. Western Supply Co., supra* [54 *Okl.* 757, 154 *P.* 648], the seller claimed that a card was attached to certain cables when they were sold. It purported to notify plaintiff that defendant "sells no goods

with a warranty." On this basis, the contention was advanced that any oral guaranty was rebutted. The "complete answer" was adjudged to be that the record failed to show that the card was brought to the attention of the plaintiff. And the court went on to say that if there was evidence tending to establish the fact, the problem was for determination by the jury.

*International Harvester Co. of America v. Bean, supra,* involved the purchase of an "auto wagon" which the buyer wanted for use in the transportation of passengers and their baggage between two cities. He explained the kind of roads to be traversed and the salesman recommended the type of vehicle purchased. The car could not operate on the roads described and rescission was sought.

International Harvester contended that the only warranty extended was contained in the purchase order. It was substantially similar to the one in the present case, providing for the replacement of defective parts over a 60-day period and reciting that "This express warranty excludes all implied warranties." The Kentucky Court of Appeals affirmed a rescission judgment saying:

"It must be borne in mind that the warranty of fitness for a particular use, which is implied by law where a manufacturer sells machinery for a purpose made known to him by the buyer thereof, relying on the skill and judgment of the manufacturer in selecting machinery adapted thereto, is a warranty which attaches itself to the contract of sale, independent of any express representation by the manufacturer of the suitability of the machinery for such use. It attaches by implication of law as a direct result of the communication by the buyer to the manufacturer of the nature of the intended use.

And while, if the parties to a contract for the sale of machinery, under such circumstances, expressly stipulate against all warranties implied by law, none will be imposed by the court against their consent, still such stipulation will not be given effect unless *fairly* made as a part of the contract of sale. Such a stipulation, relieving, as it does, the manufacturer from duties imposed by law, will be conclusively presumed to have been inserted in the contract of sale for the sole benefit of the manufacturer, the beneficiary of such relieving stipulation, and effect will not be given to such stipulation unless its inclusion in the contract *was fairly procured.*

In the case under consideration, this stipulation was contained in a printed form of order blank or contract used by appellant company. The language of the stipulation is extremely technical, 'This express warranty excludes all implied warranties'; its meaning is clear to but few persons. The writing in which such stipulation appears directs appellant company to furnish to appellee an auto vehicle, a class of machinery concerning which appellee was indisputably ignorant; and the particular style or pattern of auto vehicle ordered was that selected and recommended by the company's agent; this is undenied. Appellee testified that he explained to the company's agent the purposes for which he intended to use the auto wagon; and it is apparent that, *had he understood the full import of the stipulation, he would not have signed the order.* Under these circumstances, the court will not say that the stipulation against implied warranties was fairly procured to be included in the contract of sale. To hold that it was so included would be to give life to the letter of the contract and render inanimate the spirit thereof." 169 *S. W.*, at *pages* 550, 551. (Emphasis ours)

The same court, in *Myers v. Land,* 314 *Ky.* 514, 235 *S. W.* 2d 988 (1950), made a similar forthright declaration. The plaintiff purchased a new machine designed and represented as capable of making concrete blocks. It would not do the work and recovery of the purchase price was sought.

The purchase order contained this provision:

"There are no understandings, agreements, representations or warranties, expressed or implied, not specified herein respecting this order. The warranties, provisions, terms and conditions on the reverse side hereof are expressly made a part of this agreement." 235 *S. W.* 2d, at *page* 990.

The back of the order contained special warranties limiting the seller's liability to defects in material and workmanship which might develop under normal use and service, the obligation being limited to making good at its factory any defective parts.

Attention is attracted to the fact that the language quoted above is more comprehensive and formidable in its adverse implications to the buyer than in our case. The clause in the Henningsen purchase order makes no express reference to the exclusion of warranties express or implied except those appearing on the back of the contract. But in the case under

discussion, a jury question was held to exist as to the binding effect of the limitation of liability. The court said:

"In short, this contract undertakes to eliminate and to avoid practically every sort of warranty except the very limited one stated. There is no remedy provided in case the machinery proves to be worthless. The appellant relies upon this negation of an implied warranty.

The statute is, in the particulars involved here, a codification of the prevailing common law on the subject. This court long before its enactment recognized the principle that it was competent for the parties to a contract to stipulate expressly against implied or extrinsic warranties and to confine the obligations of the seller to specific terms. *But we have always required that such limitation of liability shall be plainly expressed.* * * * Though the present disclaimer of warranty is clear in its terms, we cannot overlook the fact that it is to be found in a long and formidable document prepared by the seller and that it was doubtless unnoticed or its import uncomprehended by the buyer. Anyone brought up to believe that for every wrong there is a remedy will pause before saying that the seller will escape all liability by merely putting in an order blank a statement to the effect that there is no assurance that the buyer will get a machine that will work. We have paused for the moment and have readily concluded that the avoidance of liability under such a circumstance is not permitted by the law. * * *" 235 S. W. 2d, at *page* 990. (Emphasis ours)

The sales contract in *Reliance Varnish Co. v. Mullins Lumber Co., supra,* contained a limited liability warranty in fine print. The officers of the buyer who made the purchase testified they had not observed the limiting clause and that it was not called to their attention. The court pointed out that it was "so located as to easily escape attention" and declared:

"Certainly it could not be said as a matter of law that appellant should have been aware of the stipulation. 'The rule in this state is that for such a clause to be applicable in any case it must be shown that it was brought to the attention of the purchaser.'" 48 S. E. 2d, at *page* 659.

Although *Cutler Corp. v. Latshaw,* 374 Pa. 1, 97 A. 2d 234 (*Sup. Ct.* 1953), involves a contract for the performance of work for a homeowner, and not a sale, the result reached

by the court reflects a pertinent point of view. The contract for the work contained on its reverse side a warrant of attorney for the confession of judgment. In denying enforcement, this was said:

> "Equally in the case at bar the defendant did not sign the warrant of attorney-confession of judgment. The reference on the face side of the contract to the 'conditions' on the reverse side, among which was buried the supposed authority for a warrant of attorney, can hardly be accepted in a court of law as an acknowledgment of a confession of judgment. While the word 'condition' may conceivably embrace almost any circumstance, upon which, or, because of which, a right is created or a liability attaches, it cannot be used to mean surrender of fundamental personal and property absolutes unless the word appears within a setting which warns of the potency of the capitulation being made.
>
> \*　　\*　　\*　　\*　　\*　　\*　　\*　　\*
>
> The case at bar falls far short of producing evidence that Miss Latshaw was even aware that a warrant of attorney was remotely contemplated. The physical characteristics of the five-page document demonstrate that the reverse sides were entirely ignored." 97 *A. 2d*, at *page* 236.

The rigid scrutiny which the courts give to attempted limitations of warranties and of the liability that would normally flow from a transaction is not limited to the field of sales of goods. Clauses on baggage checks restricting the liability of common carriers for loss or damage in transit are not enforceable unless the limitation is fairly and honestly negotiated and understandingly entered into. If not called specifically to the patron's attention, it is not binding. It is not enough merely to show the form of a contract; it must appear also that the agreement was understandingly made. *Hill v. Adams Express Co.*, 82 *N. J. L.* 373 (*E. & A.* 1911); *S. S. Ansaldo San Giorgio I v. Rheinstrom Bros. Co.*, 294 *U. S.* 494, 55 *S. Ct.* 483, 79 *L. Ed.* 1016 (1935) (clause void as against public policy); *Ferris v. Minneapolis & St. L. Ry. Co.*, 143 *Minn.* 90, 173 *N. W.* 178 (*Sup. Ct.* 1919); *Healy v. New York Cent. & H. R. R. Co.*, 153 *App. Div.* 516, 138 *N. Y. S.* 287 (1912). The same holds true in cases of such limitations

on parcel check room tickets, *Jones v. Great Northern Ry. Co.,* 68 *Mont.* 231, 217 *P.* 673, 37 *A. L. R.* 754 (1923); *Klar v. H. & M. Parcel Room,* 270 *App. Div.* 538, 61 *N. Y. S.* 2d 285 (1946), affirmed 296 *N. Y.* 1044, 73 *N. E.* 2d 912 (*Ct. App.* 1947); and on storage warehouse receipts, *French v. Bekins Moving & Storage Co.,* 118 *Colo.* 424, 195 *P.* 2d 968 (*Sup. Ct.* 1948); *Denver Public Warehouse Co. v. Munger,* 20 *Colo. App.* 56, 77 *P.* 5 (1904); *Brasch v. Sloan's Moving & Storage Co.,* 237 *Mo. App.* 597, 176 *S. W.* 2d 58 (1943); *Voyt v. Bekins Moving & Storage Co.,* 169 *Or.* 30, 119 *P.* 2d 586 (*Sup. Ct.* 1941), affirmed on rehearing 127 *P.* 2d 360 (*Sup. Ct.* 1942); on automobile parking lot or garage tickets or claim checks, *Kravitz v. Parking Service Co.,* 29 *Ala. App.* 523, 199 *So.* 727 (*Ct. App.* 1940); *Hoel v. Flour City Fuel & Transfer Co.,* 144 *Minn.* 280, 175 *N. W.* 300 (*Sup. Ct.* 1919); *Miller's Mut. Fire Ins. Ass'n of Alton, Ill. v. Parker,* 234 *N. C.* 20, 65 *S. E.* 2d 341 (*Sup. Ct.* 1951); *Agricultural Ins. Co. v. Constantine,* 144 *Ohio St.* 275, 58 *N. E.* 2d 658 (*Sup. Ct.* 1944); as to exculpatory clauses in leases releasing a landlord of apartments in a multiple dwelling house from all liability for negligence where inequality of bargaining exists, see *Annotation,* 175 *A. L. R.* 8 (1948). And the validity of release clauses in orders signed by a depositor directing a bank to stop payment of his check, exonerating the bank from liability for negligent payment, has been seriously questioned on public policy grounds in this State, *Reinhardt v. Passaic-Clifton Nat. Bank,* 16 *N. J. Super.* 430, 436 (*App. Div.* 1951), affirmed 9 *N. J.* 607 (1952). Elsewhere they have been declared void as opposed to public policy. *Speroff v. First-Cent. Trust Co.,* 149 *Ohio St.* 415, 79 *N. E.* 2d 119, 1 *A. L. R.* 2d 1150 (*Sup. Ct.* 1948).

*French v. Bekins Moving & Storage Co., supra* [118 *Colo.* 425, 195 *P.* 2d 970], is particularly significant in the present connection. There the patron signed a storage receipt which contained blanks in which were written the details of removal of the household articles, charges and other informa-

tion. Toward the bottom, in "smaller poorly printed five-point type" were eight lines authorizing the handling of the goods at a limited valuation. Plaintiff testified that she did not read the provision and no one informed her of it or of its implications. The Supreme Court of Colorado, in commenting upon the clause, said:

"'While a warehouseman may not avoid his liability for negligence, he may nevertheless stipulate with the owner as to what the extent of the latter's recovery shall be, where the rate charged the owner is based upon an agreed valuation which is put upon the property. * * * if the condition was to become a part of the contract, it was necessary that plaintiff's attention be called to it, and that she be advised that the rate to be charged was a reduced rate to be applied in consideration of her consent to the limitation of defendant's liability.'" 195 *P. 2d*, at *page* 971.

It is true that the rule governing the limitation of liability cases last referred to is generally applied in situations said to involve services of a public or semi-public nature. Typical, of course, are the public carrier or storage or parking lot cases. *Kuzmiak v. Brookchester*, 33 *N. J. Super.* 575 (*App. Div.* 1954); Annotation, *supra*, 175 *A. L. R.*, at *pp.* 14–17. But in recent times the books have not been barren of instances of its application in private contract controversies, witness, e. g., *Kuzmiak v. Brookchester, supra; Fairfax Gas & Supply Co. v. Hadary*, 151 *F. 2d* 939 (4 *Cir.* 1945); and *Cutler Corp. v. Latshaw, supra*. In the last named matter, which has been noted earlier, the court relied upon the public interest cases as authority. It said:

"Although these cases have to do with limitation on the liability of common carriers, their reasoning applies with equal force to the facts in the case at bar. When a party to a contract seeks to bind the other party with the unyielding thongs of a warrant of attorney-confession of judgment, a device not ordinarily expected by a homeowner in a simple agreement for alterations and repairs, the inclusion of such a self-abnegating provision must appear in the body of the contract and cannot be incorporated by casual reference with a designation not its own." 97 *A. 2d*, at *page* 238.

Basically, the reason a contracting party offering services of a public or *quasi*-public nature has been held to the requirements of fair dealing, and, when it attempts to limit its liability, of securing the understanding consent of the patron or consumer, is because members of the public generally have no other means of fulfilling the specific need represented by the contract. Having in mind the situation in the automobile industry as detailed above, and particularly the fact that the limited warranty extended by the manufacturers is a uniform one, there would appear to be no just reason why the principles of all of the cases set forth should not chart the course to be taken here.

It is undisputed that the president of the dealer with whom Henningsen dealt did not specifically call attention to the warranty on the back of the purchase order. The form and the arrangement of its face, as described above, certainly would cause the minds of reasonable men to differ as to whether notice of a yielding of basic rights stemming from the relationship with the manufacturer was adequately given. The words "warranty" or "limited warranty" did not even appear in the fine print above the place for signature, and a jury might well find that the type of print itself was such as to promote lack of attention rather than sharp scrutiny. The inference from the facts is that Chrysler placed the method of communicating its warranty to the purchaser in the hands of the dealer. If either one or both of them wished to make certain that Henningsen became aware of that agreement and its purported implications, neither the form of the document nor the method of expressing the precise nature of the obligation intended to be assumed would have presented any difficulty.

But there is more than this. Assuming that a jury might find that the fine print referred to reasonably served the objective of directing a buyer's attention to the warranty on the reverse side, and, therefore, that he should be charged with awareness of its language, can it be said that an ordinary layman would realize what he was relinquishing in

return for what he was being granted? Under the law, breach of warranty against defective parts or workmanship which caused personal injuries would entitle a buyer to damages even if due care were used in the manufacturing process. Because of the great potential for harm if the vehicle was defective, that right is the most important and fundamental one arising from the relationship. Difficulties so frequently encountered in establishing negligence in manufacture in the ordinary case make this manifest. 2 *Harper & James, supra,* §§ 28.14, 28.15; *Prosser, supra,* 506. Any ordinary layman of reasonable intelligence, looking at the phraseology, might well conclude that Chrysler was agreeing to replace defective parts and perhaps replace anything that went wrong because of defective workmanship during the first 90 days or 4,000 miles of operation, but that he would not be entitled to a new car. It is not unreasonable to believe that the entire scheme being conveyed was a proposed remedy for physical deficiencies in the car. *In the context* of this warranty, only the abandonment of all sense of justice would permit us to hold that, as a matter of law, the phrase "its obligation under this warranty being limited to making good at its factory any part or parts thereof" signifies to an ordinary reasonable person that he is relinquishing any personal injury claim that might flow from the use of a defective automobile. Such claims are nowhere mentioned. The draftsmanship is reflective of the care and skill of the Automobile Manufacturers Association in undertaking to avoid warranty obligations without drawing too much attention to its effort in that regard. No one can doubt that if the will to do so were present, the ability to inform the buying public of the intention to disclaim liability for injury claims arising from breach of warranty would present no problem.

In this connection, attention is drawn to the Plymouth Owner Certificate mentioned earlier. Obviously, Chrysler is aware of it because the New Car Preparation Service Guide sent from the factory to the dealer directs that it be given to the purchaser. That certificate contains a paragraph called

"Explanation of Warranty." Its entire tenor relates to replacement of defective parts. There is nothing about it to stimulate the idea that the intention of the warranty is to exclude personal injury claims.

At this point, a recent decision of the New York Court of Appeals is relevant. In *Lachs v. Fidelity & Casualty Co. of New York*, 306 *N. Y.* 357, 118 *N. E.* 2*d* 555, 557 (1954), the plaintiff's mother went to Newark Airport in order to obtain a plane flight to Miami, Florida. A vending machine was located in front of the Air Service counter where she obtained her transportation ticket. On the machine, in letters ten times as large as any other words on it, appeared "Airline Trip Insurance." Over that legend was a well illuminated display of airplanes flying round and round, and in large characters the words and numerals "25¢ For Each $5,000. Maximum $25,000." Below that on a placard, in letters "many times" the size of the other words thereon, was printed:

"Domestic
Airline Trip Insurance
25¢ for each $5,000. Maximum $25,000."

Below, in much smaller print on the same placard, appeared:

"Covers one-way flight shown on application * * * completed in 12 months within [certain points] on any scheduled airline. Policy void outside above limits."

The application mentioned was obtained by inserting 25¢ in a slot for each $5,000 of insurance desired. The application says, among other things: "I hereby apply to Company named below for Airline Trip Insurance to insure me on one Airline trip between:- * * *." Provision is made therein for the naming of a beneficiary and for the signature of the applicant.

Upon completion of the application, the prospective insured pressed a button and a policy of insurance emerged from the machine. The contract was about 11 inches long

and both sides of it were filled with printed matter. Across the front of it, in large letters which obliterated some of the printing beneath, was the statement: "This Policy Is Limited To Aircraft Accidents. Read It Carefully." The coverage clause on page 1 said:

"This insurance shall apply only to such injuries sustained following the purchase by or for the · Insured of a transportation ticket from * * * a Scheduled Airline during any portion of the first one way or round airline trip covered by such transportation ticket * * * in consequence of: (a) boarding, riding as a passenger in * * * any aircraft operated on a regular or special or chartered flight by a Civilian Scheduled Airline maintaining regular, published schedules and licensed for interstate, intrastate or international transportation of passengers by the Governmental Authority having jurisdiction over Civil Aviation * * *." 118 *N. E.* 2d, at *page* 557.

The mother's plane ticket (plaintiff was the named beneficiary) was for transportation on a Miami Airline, Inc. plane. It crashed on the way to Florida and she was killed. The insurance carrier refused to pay on the ground that the flight was not operated by a Civilian Scheduled Airline. The court sustained the refusal to dismiss the complaint, saying:

"What contract of insurance, then, did the decedent purchase? She intended to buy coverage for her flight to Miami. The defendant says it did not intend to cover her on that flight. We all know that a contract of insurance, drawn by the insurer, must be read through the eyes of the average man on the street or the average housewife who purchases it. *Neither of them is expected to carry the Civil Aeronautics Act or the Code of Federal Regulations when taking a plane.* * * * Was the decedent entitled to believe that she had purchased 'Airline Trip Insurance' through a policy 'Limited To Aircraft Accidents'? It seems to us that a jury could find that when decedent purchased her policy on an application for 'Airline Trip Insurance' from a machine having in prominent lighting those same three words, before obtaining her ticket from a counter in front of which the machine stood, she was covered on her flight, since the minds of the decedent and the company had met on that basis. * * *
* * * As we pointed out in *Hartol Products Corp. v. Prudential Ins. Co., supra,* the burden in such a case as this is on the

defendant to establish that the words and expressions used *not only are susceptible of the construction sought by defendant but that it is the only construction which may fairly be placed on them.* The defendant in its large illuminated lettering and in its application could have added proper, unambiguous words or a definition or could have avoided allowing its vending machine to be placed in front of the ticket counter 'utilized by all non-scheduled airlines operating out of the Newark Airport,' thus removing the ambiguity or equivocal character of the invitation to insure, of the application for insurance and the contract of insurance itself." 118 *N. E. 2d*, at *pages* 558–559. (Emphasis ours)

The task of the judiciary is to administer the spirit as well as the letter of the law. On issues such as the present one, part of that burden is to protect the ordinary man against the loss of important rights through what, in effect, is the unilateral act of the manufacturer. The status of the automobile industry is unique. Manufacturers are few in number and strong in bargaining position. In the matter of warranties on the sale of their products, the Automotive Manufacturers Association has enabled them to present a united front. From the standpoint of the purchaser, there can be no arms length negotiating on the subject. Because his capacity for bargaining is so grossly unequal, the inexorable conclusion which follows is that he is not permitted to bargain at all. He must take or leave the automobile on the warranty terms dictated by the maker. He cannot turn to a competitor for better security.

Public policy is a term not easily defined. Its significance varies as the habits and needs of a people may vary. It is not static and the field of application is an ever increasing one. A contract, or a particular provision therein, valid in one era may be wholly opposed to the public policy of another. See *Collopy v. Newark Eye & Ear Infirmary, 27 N. J. 29, 39* (1958). Courts keep in mind the principle that the best interests of society demand that persons should not be unnecessarily restricted in their freedom to contract. But they do not hesitate to declare void as against public policy contractual provisions which clearly tend to the injury of

the public in some way. *Hodnick v. Fidelity Trust Co.,* 96 *Ind. App.* 342, 183 *N. E.* 488 (*App. Ct.* 1932).

Public policy at a given time finds expression in the Constitution, the statutory law and in judicial decisions. In the area of sale of goods, the legislative will has imposed an implied warranty of merchantability as a general incident of sale of an automobile by description. The warranty does not depend upon the affirmative intention of the parties. It is a child of the law; it annexes itself to the contract because of the very nature of the transaction. *Minneapolis Steel & Machinery Co. v. Casey Land Agency,* 51 *N. D.* 832, 201 *N. W.* 172 (*Sup. Ct.* 1924). The judicial process has recognized a right to recover damages for personal injuries arising from a breach of that warranty. The disclaimer of the implied warranty and exclusion of all obligations except those specifically assumed by the express warranty signify a studied effort to frustrate that protection. True, the Sales Act authorizes agreements between buyer and seller qualifying the warranty obligations. But quite obviously the Legislature contemplated lawful stipulations (which are determined by the circumstances of a particular case) arrived at freely by parties of relatively equal bargaining strength. The lawmakers did not authorize the automobile manufacturer to use its grossly disproportionate bargaining power to relieve itself from liability and to impose on the ordinary buyer, who in effect has no real freedom of choice, the grave danger of injury to himself and others that attends the sale of such a dangerous instrumentality as a defectively made automobile. In the framework of this case, illuminated as it is by the facts and the many decisions noted, we are of the opinion that Chrysler's attempted disclaimer of an implied warranty of merchantability and of the obligations arising therefrom is so inimical to the public good as to compel an adjudication of its invalidity. See 57 *Yale L. J., supra,* at *pp.* 1400–1404; proposed *Uniform Commercial Code,* 1958 *Official Text,* § 202.

The trial court sent the case to the jury against Chrysler on the theory that the evidence would support a finding of breach of an implied warranty of merchantability. In fact, at one point in his charge he seemed to say that as a matter of law such a warranty existed. He also told them that:

"A provision in a purchase order for an automobile that an express warranty shall exclude all implied warranties will not be given effect so as to defeat an implied warranty that the machine shall be fit for the purposes for which it was intended unless its inclusion in the contract was fairly procured or obtained."

Thereafter, the court charged that when the car was sold a warranty arose that it was reasonably suited for ordinary use, and that if they found that it was defective and "not reasonably suited for ordinary driving" liability would exist "provided * * * you find there was an implied warranty and a breach thereof." The reasonable inference to be drawn from the whole context is that a preliminary finding against the binding effect of the disclaimer would have to be made, i. e., that the disclaimer was not "fairly procured," before an implied warranty could be deemed to exist. Even assuming that the duty to make such a finding was not as explicit as it should have been, in view of our holding that the disclaimer is void as a matter of law, the charge was more favorable to the defendant than the law required it to be. The verdict in favor of the plaintiffs and against Chrysler Corporation establishes that the jury found that the disclaimer was not fairly obtained. Thus, this defendant cannot claim to have been prejudiced by a jury finding on an aspect of the case which the court should have disposed of as a matter of law.

Chrysler raises in this court for the first time the defense that plaintiffs' failure to give reasonable notice of the breach of warranty bars their recovery. The claim was not made in the answer, pretrial order, at the trial or as a ground of appeal in the brief filed on this review. It

was added by letter filed after oral argument. It comes too late for consideration at this point in the proceedings.

The same situation arose in *National Equipment Corporation v. Moore,* 189 *Minn.* 632, 250 *N. W.* 677 (*Sup. Ct.* 1933). The contention was rejected, the court saying:

"It is enough to say that no such defense to the counterclaim was pleaded, litigated, or submitted to the jury. There was some testimony as to whether certain complaints were made &ast; &ast; &ast; but nothing to indicate to the court or opposing. counsel that such evidence was directed to prove noncompliance with said section 8423, and no such issue was submitted, or requested to be submitted, to the jury." 250 *N. W.,* at *page* 679.

## III.

## THE DEALER'S IMPLIED WARRANTY.

The principles that have been expounded as to the obligation of the manufacturer apply with equal force to the separate express warranty of the dealer. This is so, irrespective of the absence of the relationship of principal and agent between these defendants, because the manufacturer and the Association establish the warranty policy for the industry. The bargaining position of the dealer is inextricably bound by practice to that of the maker and the purchaser must take or leave the automobile, accompanied and encumbered as it is by the uniform warranty.

Moreover, it must be remembered that the actual contract was between Bloomfield Motors, Inc., and Claus Henningsen, and that the description of the car sold was included in the purchase order. Therefore, *R. S.* 46:30–21(2) annexed an implied warranty of merchantability to the agreement. *Stuart v. Burlington Co. Farmers' Exchange,* 90 *N. J. L.* 584 (*E. & A.* 1917); *Adams v. Peter Tramontin Motor Sales, supra; Cassini v. Curtis Candy Co.,* 113 *N. J. L.* 91 (*Sup. Ct.* 1934); *McCabe v. L. K. Liggett Drug Co.,* 330 *Mass.* 177, 112 *N. E. 2d* 254

(*Sup. Jud. Ct.* 1953); *Ryan v. Progressive Grocery Stores, supra; Mahoney v. Shaker Square Beverages, Inc., supra; Prosser, Law of Torts, supra,* at *p.* 495; *Vold on Sales, supra,* at *pp.* 436, 442–443; 1 *Williston on Sales, supra,* §§ 233, 242. It remains operative unless the disclaimer and liability limitation clauses were competent to exclude it and the ordinary remedy for its breach. It has been said that this doctrine is harsh on retailers who generally have only a limited opportunity for inspection of the car. But, as Chief Judge Cardozo said in *Ryan, supra*:

"The burden may be heavy. It is one of the hazards of the business.
\* \* \* \* \* \* \* \*
 \* \* \* In such circumstances, the law casts the burden on the seller, who may vouch in the manufacturer, if the latter was to blame. The loss in its final incidence will be borne where it is placed by the initial wrong." 175 *N. E.*, at *pages* 106 and 107.

Re-examination of the purchase contract discloses an ambiguous situation with respect to the warranty position of the dealer. Section 7, on the reverse side thereof, says no warranties, express or implied, are made by the dealer or manufacturer except the express warranty of the manufacturer discussed above. However, the last paragraph of the section says that: "The dealer also agrees to promptly perform and fulfill all terms and conditions of the owner service policy." That policy, as noted above, sets forth the same manufacturer's warranty and then adds a stipulation substituting "dealer" in the context wherever "manufacturer" appears. Presumably the intention was to incorporate the policy into the sales contract by reference. Accepting that to be the dealer's intention, the binding character of the limitation on its liability to the buyer under the warranty is even less apparent than in the case of Chrysler. The uncontradicted proof shows that the policy was not shown or given to Henningsen prior to or at the time of execution of the sales agreement; it was delivered with the car. No

one suggests that the clause limiting the dealer's liability to replacement of defective parts and excluding implied warranties as well as responsibility for personal injury claims was specifically brought to Henningsen's attention, or that any attempt was made to make him understand that he was yielding his right, and that of any third person claiming in his right, to recover for such injuries.

For the reasons set forth in Part I hereof, we conclude that the disclaimer of an implied warranty of merchantability by the dealer, as well as the attempted elimination of all obligations other than replacement of defective parts, are violative of public policy and void.

The trial court submitted to the jury, on the same basis as in the claim against the manufacturer, the issue of whether the disclaimer provisions in the contract were fairly procured by the dealer. The dealer also contends that the language is susceptible of the conclusion that the jurors were told as a matter of law that an implied warranty of merchantability came into existence once the sale was made by him. As we have said, a reasonable purport of the instructions in context is that upon the evidence adduced at the trial a decision was to be made as to whether the disclaimer clauses were valid, and if it was found that they were not valid, then an implied warranty existed, breach of which would support plaintiffs' action. Submission of the case to the jury on that basis represented more favorable treatment than the dealer was entitled to receive. But assuming the contention to be correct that the only conclusion to be drawn from the court's statements is that the jury were told that an implied warranty of merchantability arose from the sale as a matter of law, and that they were to decide if the proof demonstrated a breach of it, such advice was correct for the public policy reasons already expressed. Under the circumstances, there is nothing in defendant Bloomfield Motors' criticism of the charge on that score which would warrant reversal of the judgment.

## IV.

### PROOF OF BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY.

Both defendants argue that the proof adduced by plaintiffs as to the happening of the accident was not sufficient to demonstrate a breach of warranty. Consequently, they claim that their motion for judgment should have been granted by the trial court. We cannot agree. In our view, the total effect of the circumstances shown from purchase to accident is adequate to raise an inference that the car was defective and that such condition was causally related to the mishap. See, *Yormack v. Farmers' Co-op. Ass'n of N. J.,* 11 *N. J. Super.* 416 (*App. Div.* 1951); *Knapp v. Willys-Ardmore, Inc., supra.* Thus, determination by the jury was required.

The proof adduced by the plaintiffs disclosed that after servicing and delivery of the car, it operated normally during the succeeding ten days, so far as the Henningsens could tell. They had no difficulty or mishap of any kind, and it neither had nor required any servicing. It was driven by them alone. The owners service certificate provided for return for further servicing at the end of the first 1,000 miles—less than half of which had been covered at the time of Mrs. Henningsen's injury.

The facts, detailed above, show that on the day of the accident, ten days after delivery, Mrs. Henningsen was driving in a normal fashion, on a smooth highway, when unexpectedly the steering wheel and the front wheels of the car went into the bizarre action described. Can it reasonably be said that the circumstances do not warrant an inference of unsuitability for ordinary use against the manufacturer and the dealer? Obviously there is nothing in the proof to indicate in the slightest that the most unusual action of the steering wheel was caused by Mrs. Henningsen's operation of the automobile on this day, or by the use of the car between delivery and the happening of the incident. Nor is there

anything to suggest that any external force or condition unrelated to the manufacturing or servicing of the car operated as an inducing or even concurring factor.

It is a commonplace of our law that on a motion for dismissal all of the evidence and the inferences therefrom must be taken most favorably to the plaintiff. And if reasonable men studying the proof in that light could conclude that the car was not merchantable, the issue had to be submitted to the jury for determination. Applying that test here, we have no hesitation in holding that the settlement of the question of breach of warranty as to both defendants was properly placed in the hands of the jury. In our judgment, the evidence shown, as a matter of preponderance of probabilities, would justify the conclusion by the ultimate triers of the facts that the accident was caused by a failure of the steering mechanism of the car and that such failure constituted a breach of the warranty of both defendants.

A somewhat similar case is *Knapp v. Willys-Ardmore, Inc., supra,* where liability was predicated upon breach of implied warranty of merchantability. Plaintiff bought a new car from defendant and drove it 107 miles in eight days. During that period it was used only for pleasure and was driven properly and without incident. Immediately before the accident, Mrs. Knapp was driving along at a moderate speed, when the steering mechanism failed to function and the car suddenly veered to the right over the curb and into a telephone pole. After the collision it was noted that the tie-rod at the right end of the steering assembly had become disconnected and had dropped to the ground. Inspection showed that the rod had been bent and a connecting sleeve or turnbuckle had been broken. A witness who had been driving in the opposite direction testified that he observed the right front wheel "wobbling" and the car "seemed to go out of control," over the curb and into the pole. A mechanic gave some testimony from which it might be inferred that the tie-rod had been broken before the impact with the pole.

It was held that the facts created a reasonable inference that the car was defective when delivered and that the defect was not caused by subsequent conduct of the plaintiff. The court pointed out that while existence of a defect cannot be found on the basis of mere conjecture or guess, yet it is not necessary to exclude every other possible cause which the ingenuity of counsel might suggest. The finding of breach of an implied warranty of merchantability was held to be circumstantially supportable by the necessary *quantum* of proof.

It may be conceded that the opinion of the automobile expert produced by the plaintiffs in the present case was not entitled to very much probative force. However, his assertion in answer to the hypothetical question that the unusual action of the steering wheel and front wheels must have been due to a mechanical defect or failure of something from the steering wheel down to the front wheels, that "something down there had to drop off or break loose" to cause the car to act in the manner it did, cannot be rejected as a matter of law. Its evaluation under all of the circumstances was a matter for jury consideration. Defendants argue that the proof of his qualifications was not adequate to warrant the admission of his testimony. But the matter of an expert's competency to testify is primarily for the discretion of the trial court. An appellate tribunal will not interfere unless a clear abuse of discretion appears. *Carbone v. Warburton,* 11 *N. J.* 418 (1953). In our view, the experience of the witness, as an automobile repairman and as an appraiser of damaged cars, was such as to preclude a holding by us that the trial court accepted his qualifications without any reasonable basis.

In *M. Dietz & Sons, Inc. v. Miller,* 43 *N. J. Super.* 334 (*App. Div.* 1957), defendant purchased a new car from a dealer. He drove it only 50 miles when, on the day of the accident while driving in traffic, he applied the brakes in order to stop in back of the Dietz vehicle. The brakes failed completely and Miller ran into the rear of that car.

Dietz sued Miller, who cross-claimed against the dealer for negligent installation or inspection of the power brakes. The Appellate Division properly declared that "even where the rule of *res ipsa loquitur* does not apply, the plaintiff may nevertheless show 'defendant's negligence by circumstantial or ·direct evidence of specific acts from which liability may be inferred.'" *Supra,* at *page* 338. And further that: "The real issue here is the efficacy of the circumstantial proof to create a fact issue as to defendant's negligence either in installation or inspection of the unit upon installation. There can be no doubt as to the sufficiency of the evidence to justify the finding that there was a power brake failure * * *." *Supra,* at *pages* 338–339. And see, *Mazzietelle v. Belleville Nutley Buick Co.,* 46 *N. J. Super.* 410 (*App. Div.* 1957); *Yormack v. Farmers' Co-op. Ass'n of N. J., supra.* Although these latter cases sound in negligence, the test for finding a jury question in them is even more stringent. Circumstantial evidence sufficient to create a jury question as to the negligence of a manufacturer or dealer would clearly justify the same result where the issue is breach of warranty. As the late Chief Justice Vanderbilt said, in *Simon v. Graham Bakery, supra,* liability would exist notwithstanding all care was used to prevent a breach.

## V.

### The Defense of Lack of Privity Against Mrs. Henningsen.

Both defendants contend that since there was no privity of contract between them and Mrs. Henningsen, she cannot recover for breach of any warranty made by either of them. On the facts, as they were developed, we agree that she was not a party to the purchase agreement. *Faber v. Creswick,* 31 *N. J.* 234 (1959). Her right to maintain the action, therefore, depends upon whether she occupies such legal status thereunder as to permit her to take advantage of a breach of defendants' implied warranties.

For the most part the cases that have been considered dealt with the right of the buyer or consumer to maintain an action against the manufacturer where the contract of sale was with a dealer and the buyer had no contractual relationship with the manufacturer. In the present matter, the basic contractual relationship is between Claus Henningsen, Chrysler, and Bloomfield Motors, Inc. The precise issue presented is whether Mrs. Henningsen, who is not a party to their respective warranties, may claim under them. In our judgment, the principles of those cases and the supporting texts are just as proximately applicable to her situation. We are convinced that the cause of justice in this area of the law can be served only by recognizing that she is such a person who, in the reasonable contemplation of the parties to the warranty, might be expected to become a user of the automobile. Accordingly, her lack of privity does not stand in the way of prosecution of the injury suit against the defendant Chrysler.

The context in which the problem of privity with respect to the dealer must be considered, is much the same. Defendant Bloomfield Motors is chargeable with an implied warranty of merchantability to Claus Henningsen. There is no need to engage in a separate or extended discussion of the question. The legal principles which control are the same in quality. The manufacturer establishes the network of trade and the dealer is a unit utilized in that network to accomplish sales. He is the beneficiary of the same express and implied warranties from the manufacturer as he extends to the buyer of the automobile. If he is sued alone, he may implead the manufacturer. *Davis v. Radford,* 233 *N. C.* 283, 63 *S. E.* 2d 822, 24 *A. L. R.* 2d 906 (*Sup. Ct.* 1951); *Annotation,* 24 *A. L. R.* 2d 913 (1952). His understanding of the expected use of the car by persons other than the buyer is the same as that of the manufacturer. And so, his claim to the doctrine of privity should rise no higher than that of the manufacturer. See, *e. g., Haut v.*

*Kleene, supra; Greenberg v. Lorenz, supra; Ryan v. Progressive Grocery Stores, Inc., supra.*

The situation before us in its legal aspects is very similar to that which we dealt with recently in *Faber v. Creswick, supra.* There, in a landlord and tenant relationship the lease contained a covenant to have the premises in good repair at the inception of the occupancy. The wife of the tenant was injured by reason of a breach of that agreement. We held that she was entitled to recover damages even though she was not a party to the lease. In doing so, our approval was given to the doctrine proposed by Section 357 of the *Restatement of Torts* that where a lessor agrees to keep the premises let in good repair, he is subject to liability for bodily harm caused to the lessee and others on the land with his consent by a condition of disrepair. True, the suit in *Faber* was in tort while this one is in contract. But it cannot be overlooked that historically actions on warranties were in tort also, sounding in deceit. *Simon v. Graham Bakery, supra,* 17 *N. J., at pages* 528, 529; 1 *Williston on Sales, supra,* §§ 195–197. The contract theory gradually emerged, although the tort idea has continued to lurk in the background, making the warranty "a curious hybrid of tort and contract." *Prosser, supra,* § 83. An awareness of this evolution makes for ready acceptance of the relaxation of rigid concepts of privity when third persons, who in the reasonable contemplation of the parties to a warranty might be expected to use or consume the product sold, are injured by its unwholesome or defective state.

It is important to express the right of Mrs. Henningsen to maintain her action in terms of a general principle. To what extent may lack of privity be disregarded in suits on such warranties? In that regard, the *Faber* case points the way. By a parity of reasoning, it is our opinion that an implied warranty of merchantability chargeable to either an automobile manufacturer or a dealer extends to the purchaser of the car, members of his family, and to other persons occupying or using it with his consent. It would be

wholly opposed to reality to say that use by such persons is not within the anticipation of parties to such a warranty of reasonable suitability of an automobile for ordinary highway operation. Those persons must be considered within the distributive chain.

Harper and James suggest that this remedy ought to run to members of the public, bystanders, for example, who are in the path of harm from a defective automobile. 2 *Harper & James, supra, note* 6, *p.* 1572. Section 2–318 of the Uniform Commercial Code proposes that the warranty be extended to "any natural person who is in the family or household of his buyer or who is a guest in his home if it is reasonable to expect that such person may use, consume or be affected by the goods and who is injured in person by breach of the warranty." And the section provides also that "A seller may not exclude or limit the operation" of the extension. A footnote thereto says that beyond this provision "the section is neutral and is not intended to enlarge or restrict the developing case law on whether the seller's warranties, given to his buyer, who resells, extend to other persons in the distributive chain." *Uniform Commercial Code, supra,* at *p.* 100.

It is not necessary in this case to establish the outside limits of the warranty protection. For present purposes, with respect to automobiles, it suffices to promulgate the principle set forth above.

In his charge as to Mrs. Henningsen's right to recover on the implied warranty, the trial court referred to her husband's testimony that he was buying the car for her use, and then instructed the jury that on such facts the warranty extended to her. In view of our holding, obviously the protection of the warranty runs to her as an incident of the sale without regard to such testimony. Accordingly, the contention that the instruction was reversible error must be rejected.

Defendants rely upon certain cases for the proposition that lack of privity of contract bars Mrs. Henningsen's recovery.

The pertinent ones are *Tomlinson v. Armour & Co., supra; Cassini v. Curtis Candy Co., supra; Schlosser v. Goldberg,* 123 *N. J. L.* 470 (*Sup. Ct.* 1939); *General Home, etc., Co. v. American, etc., Inc.,* 26 *N. J. Misc.* 24 (*Cir. Ct.* 1947). *Tomlinson v. Armour & Co.* provides the foundation for the others. It was decided 52 years ago and the principle on which defendants seek support for their case is contained in a short statement which, if applied in the light of the modern marketing conditions, is not inconsistent with the basic substance of the rule we have now espoused. In discussing the legal consequences of a sale of canned ham, Chancellor Pitney said:

> "Whether a warranty be express or implied, it is a matter of contract, rendering the maker liable in case of breach, notwithstanding he used all care to prevent a breach, but rendering him liable in ordinary circumstances only to the party with whom he contracted, *or to others for whose benefit the contract was made.*" **75 N. J. L.,** at *pages* 754–755. (Emphasis ours)

In 1908, the need of the community for the making of distinctions growing out of the nature of the contract was not as pressing as it is in this commercial era. A common rule was applied, as indicated by the citation of *Marvin Safe Co. v. Ward,* 46 *N. J. L.* 19 (*Sup. Ct.* 1884), and *Styles v. F. R. Long Company,* 67 *N. J. L.* 413 (*Sup. Ct.* 1902), which involved agreements wholly unrelated to the sale of products for consumer use. In this day, given the present situation, it is extremely unlikely that such an enlightened jurist as Chancellor Pitney would not find his expression that "others for whose benefit the contract was made" could sue for its breach compatible in spirit with the doctrine we deem to be necessary in the interest of justice. In any event, to the extent that *Tomlinson v. Armour & Co.* and its cited progeny conflict with our ruling, they can no longer be considered the law of this State. See *Collopy v. Newark Eye and Ear Infirmary, supra.*

██ The final argument on this point relates to the damage claim of Claus Henningsen. That claim has two

aspects: one for property damage to the automobile and the other for medical and hospital expenses and loss of his wife's society and services. As to the first, he being an actual party to the contract of sale, and the owner of the automobile, clearly the property damage is recoverable. The second claim is a derivative one, stemming from his wife's right. *Faber v. Creswick, supra.* But it is universally known that in family relations husbands and fathers are ordinarily responsible for such expenses of spouses and children. It would be illogical to accept the right of a wife to recover in contract for breach of warranty and to hold that the husband's derivative claim was not within the contemplation of the parties when the agreement of sale was made. For this reason it was proper to submit Henningsen's consequential losses to the jury as an element of damage.

## VI.

Plaintiffs contend on cross-appeal that the negligence claim against the defendants should not have been dismissed. Their position is that on the facts developed, the issue should have been submitted to the jury for determination. The result we have reached on the other aspects of the case makes it unnecessary to consider the problem. For that reason we express no opinion thereon.

All other ground of appeal raised by both parties have been examined and we find no reversible error in any of them.

## VII.

Under all of the circumstances outlined above, the judgments in favor of the plaintiffs and against defendants are affirmed.

*For affirmance*—Chief Justice WEINTRAUB, and Justices BURLING, JACOBS, FRANCIS, PROCTOR and SCHETTINO—6.

*For reversal*—None.