80 N.J. Super. 184 (1963)
193 A.2d 275
EDWIN F. JAKUBOWSKI, PLAINTIFF-APPELLANT,
v.
MINNESOTA MINING AND MANUFACTURING, A CORPORATION OF DELAWARE, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued April 29, 1963.
Decided July 12, 1963.
*188 Before Judges GOLDMANN, FREUND and FOLEY.
Mr. Joseph Coult argued the cause for appellant (Mr. Peter Cammelieri, attorney).
Mr. William R. Morrison argued the cause for respondent (Messrs. Morrison, Lloyd & Griggs, attorneys).
The opinion of the court was delivered by GOLDMANN, S.J.A.D.
Plaintiff appeals from a Superior Court, Law Division, judgment of involuntary dismissal, with prejudice, entered in defendant's favor at the close plaintiff's case.

I.
Defendant manufactures abrasive discs, and among its customers is the Mahwah, N.J. plant of the Ford Motor Company, plaintiff's employer. Plaintiff was injured when a disc he was using in a grinding operation on the Ford assembly line broke and hit him. He sued in two counts. The first charged negligence in manufacturing the disc; the second alleged breach of warranty, both express and implied (merchantability and fitness for use). Defendant's answer denied these claims and set up the defenses of contributory negligence, assumption of risk, lack of privity of contract, lack of consideration and no warranty.
Plaintiff had worked for Ford for some 17 years as a mechanic and body finisher on the production line, and he was fully familiar with the tools used in these operations. On the day of the accident he was acting as relief man for the regular crew of grinders and solderers. One of the grinders asked to be relieved. He had been smoothing down the brass weld where the windshield and door post of the *189 skeleton automobile body come together, and for this purpose was using a grinding machine run by an air-operated motor rotating at 3,600 revolutions a minute a vertical shaft to which one of defendant's abrasive discs was attached. This operation is known as "snagging," described by one witness as exposing the abrasive to "a very punishing type of treatment where you would encounter sharp edges and abrupt corners." Plaintiff testified that "As I was grinding this braze with this disc and putting pressure on it, it snapped in half, striking me right here [in the lower mid-abdomen]." The broken disc was not produced at the trial, nor had anyone examined it or checked to see what had caused the break.
The disc plaintiff was using was defendant's type C, 24-grit (the coarseness of the abrasive), fibre-backed, flexible grinding disc, 9" in diameter. The C-type discs were described in defendant's list price catalogue as follows:

"3M DISCS TYPE `C'  GREEN BACK
Are stronger, sharper, and longer-lived than ever before available  anywhere. This construction is best all-purpose disc  for edge sanding, flat sanding and solder sanding or oil filling operations. It's `shape controlled' to resist effects of humidity and temperature.
Aluminum Oxide Mineral, Heavy All-Fibre Backing, Closed Coat, Resinbonded, 150-50, 36, 24, 16"
Plaintiff testified that during his years in Ford's employ grinding discs often broke: "We got hit many a time, but never thought nothing of it. A lot of fellows get hurt." Part of his job was to supply the men on the production line with grinding discs, and he would bring them from the supply room in batches of 100.
Plaintiff called the Mahwah plant purchasing agent, Schumann, as his witness. He testified that the engineering department, after working with the manufacturers, would determine what production tools and equipment were to be purchased. Upon receipt of the necessary requisition, his department would then put through the order. He said that the plant safety engineers coordinated with the production engineers in deciding whether a particular item was reasonably *190 safe for use. The plant had purchased 200,000 to 300,000 of defendant's 9", 24-grit grinding discs prior to the accident, and an additional 50,000 to 100,000 after the occurrence. Ford then changed to another manufacturer and type of disc, on recommendation of its engineering department.
Plaintiff's only other witness was Gearhart, manager of the process engineering department. Counsel put a short hypothetical question to the witness, asking him to assume that plaintiff had been performing the grinding operation just described, and then inquired whether he had an opinion as to what caused the "wheel" to break. (Obviously, the reference was to the grinding disc, as appears soon after in the record.) The answer was, "The wheel itself must have had a defect." The basis for his opinion was "The experience I've had with this type of equipment, and that it is not related to the tool that is driving the wheel. Any relationship is with the disc itself, rather than the machine." No further explanation or detailing of this "experience" was volunteered or elicited. Gearhart said he had examined the "specifications" for the C-24 disc, indicating these were the list price description, quoted above, and a page of pictures from the catalogue showing the machine being used in different kinds of grinding operations. Aside from these, he said, there were no other representations made to the Ford Company.
Gearhart testified that the company had tested different discs, including defendant's, "for durability and effectiveness." In answer to the trial judge's inquiry whether defendant had made any representation with regard to the number of revolutions at which it would be safe to operate the disc, Gearhart answered that "we do have information given to us by the vendor on the recommended speeds. The speed of this particular disc I had no occasion to know in particular, nor do I retain this information. * * *."
On cross-examination Gearhart said that the engineering department had selected defendant's 24-grit disc as the best *191 there was in the features they were looking for. The tests it had run were not conducted in a laboratory but rather directly on the production line, for durability and cost comparison. Asked whether the discs had ever snagged and broken, Gearhart said he had never seen or heard of this happening. Although it was the engineering group that selected and recommended for purchase the discs to be used, he was not entirely clear as to whether the safety engineers played a part in the selection. He said that discs used for the kind of rough grinding plaintiff was doing would last for about five body units.
Plaintiff having rested, defendant moved for judgment of involuntary dismissal on both the negligence and warranty aspects of the case. These were separately argued and the motion granted. This appeal followed.

II.
On a motion for dismissal we must, of course, take as true all evidence which supports plaintiff's view and give him the benefit of all legitimate inferences which may be drawn therefrom.
We first treat of plaintiff's claim of negligent manufacture. This was spelled out in the first count of the complaint, wherein plaintiff alleged that defendant failed to use proper materials in manufacturing the disc, failed to use them in proper proportion, did not properly treat the disc, failed to provide a safety factor, failed to inspect and test the disc to ascertain whether it conformed to minimum standards and, finally, failed to mark the disc with the speed at which it could safely be operated, contrary to good practice in the trade. Except for the lack of an operating speed indication on the disc, none of these allegations were proved. Indeed, plaintiff made no attempt to prove them.
The general rule today is that a manufacturer owes the duty of exercising reasonable care in production to avoid unreasonable risk of harm from the use of his products by *192 those likely to be exposed to the risk. Trowbridge v. Abrasive Co. of Philadelphia, 190 F.2d 825 (3 Cir. 1951), a grinding wheel case. 2 Restatement, Torts, § 395, p. 1073 (1934), states the rule as follows:
"A manufacturer who fails to exercise reasonable care in the manufacture of a chattel which, unless carefully made, he should recognize as involving an unreasonable risk of causing substantial bodily harm to those who lawfully use it for a purpose for which it is manufactured and to those whom the supplier should expect to be in the vicinity of its probable use, is subject to liability for bodily harm caused to them by its lawful use in a manner and for a purpose for which it is manufactured."
And see ibid., § 398, p. 1084. Harper and James, in their Law of Torts, vol. 2, § 28.3, p. 1540 (1956), roughly divide a manufacturer's specific obligations into two categories for descriptive convenience. The first concerns the design, plan, structure and specifications for the product, and the second involves miscarriages in the process of manufacture, resulting in the product's being "defective" in some respect. Thus, under the first category the maker of an article for sale or use by others is required to use reasonable care and skill in designing it and in providing specifications, to insure that it is reasonably safe for the purposes for which it is intended, as well as for other uses which are foreseeably probable. Ibid., § 28.4, p. 1541. (The Trowbridge case is an example, the finding of negligence there being based in part on the "closed setting" method that had been used in manufacturing the grinding wheel, a method conducive to the formation of internal flaws.) As for liability for defects, the manufacturer must be reasonably careful to prevent dangerous conditions in the article he makes for sale or use, caused by a miscarriage in the manufacturing process  a duty calling for reasonable skill and care in the process of manufacture and reasonable inspection or tests to discover defects. Ibid., § 28.11, p. 1557.
The applicable principles are thus readily stated. The question of plaintiff's right to sue for negligence  the always present problem of so-called "privity"  need not detain us. *193 The modern tort concept is that the manufacturer's duty extends to anyone who may reasonably be expected to be in the vicinity of the chattel's probable use, and to be endangered if it is defective. Prosser on Torts (2d ed. 1955), § 84, p. 501; 2 Restatement, Torts, § 395, above.
The core problem here is one of proof. Plaintiff had the burden of establishing that his injury resulted from a condition of the product arising from negligent manufacture. As we have already observed, he made no effort to do so. Since, in a case like this, plaintiff had no direct proof of what took place in the course of defendant's manufacturing process, he obviously had to fall back on circumstantial evidence. Plaintiff suggests the applicability of the res ipsa loquitur doctrine. But to bring himself within that doctrine, he must demonstrate that the cause of his injury was something which lay within defendant's responsibility. In short, he has the burden of introducing evidence to exclude the possibility that the injury was due to his own conduct, or that of an intermediate handler  here, at the least, the grinder whom he relieved. Prosser, op. cit., § 84, p. 505; and see Harper and James, op. cit., § 28.12, p. 1560. Compare Kramer v. R.M. Hollingshead Corp., 5 N.J. 386 (1950). This he did not do.
There was no attempt to introduce the kind of expert evidence found in the Trowbridge case. And see Moran v. Pittsburgh-Des Moines Steel Co., 166 F.2d 908 (3 Cir. 1948); O'Donnell v. Asplundh Tree Expert Co., 13 N.J. 319, 327 (1953). Gearhart's testimony did not serve to provide the kind of expert testimony required. As indicated above, all he said was that the wheel broke because "the wheel itself must have had a defect," the basis for his opinion being "the experience I've had with this type of equipment." This generality is not sufficient to establish any kind of a standard of care. See, passim, 2 Wigmore on Evidence (3d ed. 1940), § 555, p. 634 et seq., and cf. Sanzari v. Rosenfeld, 34 N.J. 128, 134-135 (1961). It was essential that plaintiff establish by some competent expert testimony that defendant failed to meet the accepted standard of care required *194 in the manufacturing of grinding discs such as the one here involved. The reason is that such a standard does not fall within the "common knowledge" of the average juror.
Plaintiff claims that defendant's liability flows from its failure to designate on the face of the grinding disc the maximum speed at which it could be operated. But plaintiff's proofs fail to sustain, or even to suggest, that the breaking of the disc was in any way related to the speed at which the machine was operated.
It is settled that there must be some breach of duty (by either action or inaction) on the part of defendant toward plaintiff which, if observed, would have avoided the injury complained of. Brody v. Albert Lifson & Sons, 17 N.J. 383, 389 (1955). And defendant's negligence must be the proximate cause of plaintiff's injury. The burden of proof is plaintiff's.
Considering plaintiff's proofs in a light most favorable to him, and giving him the advantage of every reasonable inference, we conclude that the trial judge correctly ruled that the evidence did not present a jury question on the subject of negligence. He properly granted the motion for involuntary dismissal on this phase of the case. To have ruled otherwise would have allowed the jury to proceed on nothing more than speculation and surmise.

III.
We now turn to the question of warranty. The law applicable at the time the injury happened on July 17, 1958 was the Uniform Sale of Goods Law, R.S. 46:30-1 et seq., as amended. (The Uniform Commercial Code, N.J.S. 12A:1-101 et seq., became effective January 1, 1963.)
Plaintiff relies, in part, upon an express warranty, based upon the quoted description of the "3M Discs  Type `C'" found in defendant's price catalogue. R.S. 46:30-18 (§ 12 of the former Uniform Sales Act) defines "express warranty" as
*195 "Any affirmation of fact or any promise by the seller relating to the goods is an express warranty if the natural tendency of such affirmation or promise is to induce the buyer to purchase the goods, and if the buyer purchases the goods relying thereon. No affirmation of the value of the goods, nor any statement purporting to be a statement of the seller's opinion only, shall be construed as a warranty."
And see the present provisions of the Uniform Commercial Code, N.J.S. 12A:2-313 and 316.
The only language upon which plaintiff may rely in the catalogue description consists of the words describing the type C discs as "stronger, sharper, and longer-lived than ever before available  anywhere. This construction is the best all-purpose disc." This language does not amount to an express guaranty; at best, it is only a statement of the seller's opinion. Cf. Adams v. Peter Tramontin Motor Sales, Inc., 42 N.J. Super. 313, 317-319 (App. Div. 1956). Since plaintiff was unable to produce any evidence of other representations made by defendant, he did not establish a case of express warranty. However, he did establish a case of implied warranty, so that defendant should have been called upon to go forward with its proofs and the matter submitted to the jury.
R.S. 46:30-21 (§ 15 of the former Uniform Sales Act), dealing with implied warranties of quality or fitness, provides, in part:
"Subject to the provisions of this chapter and of any statute in that behalf, there is no implied warranty or condition as to the quality or fitness for any particular purpose of goods supplied under a contract to sell or a sale, except as follows:
(1) Where the buyer, expressly or by implication, makes known to the seller the particular purpose for which the goods are required, and it appears that the buyer relies on the seller's skill or judgment (whether he be the grower or manufacturer or not), there is an implied warranty that the goods shall be reasonably fit for such purpose.
(2) Where the goods are bought by description from a seller who deals in goods of that description (whether he be the grower or manufacturer or not), there is an implied warranty that the goods shall be of merchantable quality." *196 And see the Uniform Commercial Code, N.J.S. 2A:2-314 and 315.
Defendant seeks to bar plaintiff from recourse to implied warranty by contending that he is not within the distributive chain of persons entitled to recovery for an alleged breach of warranty. This, of course, is the defense of lack of privity raised in the answer.
Although recognizing that Henningsen v. Bloomfield Motors, Inc., 32 N.J. 358, 75 A.L.R.2d 1 (1960), breached the wall of that defense, defendant would limit that case to a holding that an implied warranty of merchantability chargeable to a manufacturer extends only to the purchaser or a member of his family, and that plaintiff, as an employee of Ford, the purchaser of defendant's discs, is beyond the limit of warranty protection set out in Henningsen. To reenforce this argument defendant refers to the Uniform Commercial Code, which displaced the Uniform Sale of Goods Law, pointing to the provision of N.J.S. 12A:2-318 that a seller's warranty, whether express or implied, "extends to any natural person who is in the family or household of his buyer or who is a guest in his home if it is reasonable to expect that such person may use, consume or be affected by the goods and who is injured in person by breach of the warranty." In addition to the fact that this provision does not retrospectively affect our case, note 3 to N.J.S. 12A:2-318 states that "the section is neutral and is not intended to enlarge or restrict the developing case law on whether the seller's warranties, given to his buyer who resells, extend to other persons in the distributive chain."
Increasingly during recent years courts, following the lead of authorities in tort law, have broken away from the privity requirement and found some way of holding a manufacturer strictly liable to the user of his product. There has been a deepening feeling that social policy requires that the burden of accidental injuries due to defective chattels be placed upon the producer, he being best able to distribute the risk to the general public through prices and insurance. Prosser on *197 Torts (2d ed. 1955), § 84, p. 506. That author notes that in addition to social policy there is the difficulty of proving negligence, even with the aid of res ipsa loquitur; the wastefulness and uncertainty of a series of warranty actions carrying liability back through the retailer and jobber to the original maker; the practice of reputable manufacturers' standing behind their goods as sound business policy; and the public interest served by giving the consumer or user maximum protection at the hands of someone  the producer who, as a practical and moral matter, is the one best able to afford it.
Standing in the way of an extension of strict liability (under implied warranty) beyond the immediate buyer to the ultimate consumer or user has been the common acceptance of the idea of warranty as necessarily connected with contract. Absent a contract between the manufacturer or seller and the person who uses or consumes the goods, most courts have consistently refused to find any warranty. This overlooks the fact that the action for breach of warranty was originally a tort action, for breach of a duty assumed. Prosser, op. cit., § 83, p. 493 and § 84, p. 507; and see Harper and James, op. cit., § 28.15, p. 1570; Jaeger, "Warranties of Merchantability and Fitness for Use: Recent Developments," 16 Rutg. L. Rev. 493, 500 (Spring 1962).
Since the warranties we discuss do not represent an expressed or implied-in-fact intent, but are warranties imposed by law as vehicles of social policy, present-day authorities hold that the courts should extend them as far as relevant social policy requires. Harper and James, § 28.16, p. 1571. As the court said in Ketterer v. Armour & Co., 200 F. 322, 323 (D.C.S.D.N.Y. 1912) (a food case): "The remedies of injured consumers ought not to be made to depend upon the intricacies of the law of sales. The obligation of the manufacturer should not be based alone upon privity of contract. It should rest * * * upon `the demands of social justice.'"
Justice Francis, speaking for the court in the Henningsen case, was of the opinion that "an implied warranty *198 of merchantability chargeable to either an automobile manufacturer or a dealer extends to the purchaser of the car, members of his family, and to other persons occupying or using it with his consent. It would be wholly opposed to reality to say that use by such persons is not within the anticipation of parties to such a warranty of reasonable suitability of an automobile for ordinary highway operation." (32 N.J., at pages 414-415). It is logical to extend this language to the present case, for the implied warranty of merchantability chargeable to defendant manufacturer extends to plaintiff, an employee using the grinding disc with his employer's consent. He was a member of the Ford plant family, whose use of the grinding disc was certainly within the reasonable anticipation of defendant.
Through the years courts have "by deft judicial manipulation" sought to circumvent the privity requirement and find the manufacturer liable to the consumer or user of his product. Thus, among the theories they have evolved have been that the manufacturer's vendee was the agent of the ultimate consumer or user, the warranty was "assigned," the consumer was a third-party beneficiary, or privity existed in the "understanding of all right thinking persons." See Milling, "Henningsen and the Pre-Delivery Inspection and Conditioning Schedule," 16 Rutg. L. Rev. 559, 560 (Spring 1962); Prosser, op. cit., pp. 507-508; Jaeger, op. cit., 16 Rutg. L. Rev., at page 556. There is no need to resort to any of these theories, all of them inadequate, nor to the theory, projected by some writers (e.g., Harper and James, op. cit., § 28.16, p. 1571) that consumer protection calls for warranties by the manufacturer to "run with the title," as in the case of conveyances of land. What appears to be the sounder approach is that the implied warranty is a matter of strict tort liability, not dependent upon a contract between the parties. It arises because the manufacturer or seller, in marketing his goods, assumes such a responsibility toward any consumer or user who, in reasonable contemplation, might be injured. See Prosser, op. cit., § 84, p. 508.
*199 We find that the provisions of R.S. 46:30-21(2), above, apply and that there was an implied warranty by defendant that its grinding discs would be of merchantable quality. Peterson v. Lamb Rubber Co., 54 Cal.2d 339, 5 Cal. Rptr. 863, 353 P.2d 575 (Sup. Ct. 1960); DiVello v. Gardner Machine Co., 102 N.E.2d 289 (Ohio Com. Pl. 1951) (probably overruled by Wood v. General Elec. Co., 159 Ohio St. 273, 112 N.E.2d 8 (Sup. Ct. 1953)); cf. Henningsen, above; Pabon v. Hackensack Auto Sales, Inc., 63 N.J. Super. 476 (App. Div. 1960); Adams v. Peter Tramontin Motor Sales, Inc., above. And see the very recent cases of Hart v. Goodyear Tire & Rubber Co., 214 F. Supp. 817 (D.C.N.D. Ind. 1963); Goldberg v. Kollsman Instrument Corp., 12 N.Y.2d 432, 240 N.Y.S.2d 592, 191 N.E.2d 81 (Ct. App. 1963).
Defendant contends that there can be no liability based on implied warranty under the Uniform Sale of Goods Law because of R.S. 46:30-21(3): "If the buyer has examined the goods, there is no implied warranty as regards defects which such examination ought to have revealed." The point made is that plaintiff by his own proofs established that the production engineers at the Mahwah plant had tested the grinding discs. However, the testimony was that these tests were run directly on the production line, and had as their purpose nothing more than a determination of the durability and effectiveness of the discs. Internal weaknesses due to deficiencies or miscarriages in the manufacturing process would not be apparent unless the disc or discs tested were taken apart. In short, quality testing beyond the limited test made by the engineering department was impossible without destroying the very subject matter of the test. Subsection (3) of R.S. 46:30-21 does not apply.
Accordingly, we conclude that an implied warranty of merchantability was established by plaintiff's proofs. And since defendant, by reasonable implication, knew from the Mahwah plant production engineers (who were obtaining discs from various manufacturers for comparison purposes) *200 the particular purpose for which the discs were required  grinding operations  and since it can reasonably be said that Ford relied on defendant's manufacturing skill, there is also present here an implied warranty that the discs would be reasonably fit for industrial grinding purposes. Indeed, the catalogue page in evidence shows defendant's type C discs being used for this very purpose, in a variety of positions.
The suggestion is made that the discs were sold under a trade name, in which case there would be no implied warranty of fitness for any particular purpose under R.S. 46:30-21(4), above. But such is not the case. Defendant, for convenience, catalogued the grinding discs as "3M Discs Type `C'  Green Back." We do not consider such designation a trade name.
There was sufficient here to call for a defense and eventual jury determination, including determination of the question whether plaintiff used the disc for a purpose and in a manner not contemplated by the warranty.
The judgment is therefore reversed and the matter remanded for full trial in the Law Division.
FOLEY, J.A.D. (dissenting).
My disagreement with the majority stems not from difference of viewpoint as to the controlling law, but rather from the application of the law to the facts of the case.
The landmark case of Henningsen v. Bloomfield Motors, Inc., 32 N.J. 358, 75 A.L.R.2d 1 (1960), holds that under modern marketing conditions, when a manufacturer puts a new automobile in the stream of trade and promotes its purchase by the public, an implied warranty that it is reasonably suitable for use as such accompanies it into the hands of the ultimate purchaser. 32 N.J., at p. 384. Thus, the court included within the ambit of contractual privity the ultimate purchaser, and persons using the car under his right. Just as Justice Francis could see "no rational doctrinal basis for differentiating between a fly in a bottle of beverage and a defective automobile," 32 N.J., at p. 383, *201 neither the majority nor I perceive any reason for distinquishing between a defective automobile and a defective grinding disc. But "defective" when? As I see it, there inheres in the rationale of Henningsen the fact that the defect in question was present when the automobile was placed in the "stream of trade." Thus the court took considerable pains to point out the following:
"The new Plymouth was turned over to the Henningsens on May 9, 1955. No proof was adduced by the dealer to show precisely what was done in the way of mechanical or road testing beyond testimony that the manufacturer's instructions were probably followed. Mr. Henningsen drove it from the dealer's place of business in Bloomfield to their home in Keansburg. On the trip nothing unusual appeared in the way in which it operated. Thereafter, it was used for short trips on paved streets about the town. It had no servicing and no mishaps of any kind before the event of May 19. That day Mrs. Henningsen drove to Asbury Park. On the way down and in returning the car performed in normal fashion until the accident occurred. She was proceeding north on Route 36 in Highlands, New Jersey, at 20-22 miles per hour. The highway was paved and smooth, and contained two lanes for northbound travel. She was riding in the right-hand lane. Suddenly she heard a loud noise `from the bottom, by the hood.' It `felt as if something cracked.' The steering wheel spun in her hands; the car veered sharply to the right and crashed into a highway sign and a brick wall. No other vehicle was in any way involved. A bus operator driving in the left-hand lane testified that he observed plaintiffs' car approaching in normal fashion in the opposite direction; `all of a sudden [it] veered at 90 degrees * * * and right into this wall.' As a result of the impact, the front of the car was so badly damaged that it was impossible to determine if any of the parts of the steering wheel mechanism or workmanship or assembly were defective or improper prior to the accident. The condition was such that the collision insurance carrier, after inspection, declared the vehicle a total loss. It had 468 miles on the speedometer at the time." 32 N.J., at pp. 368-369.
The plain purpose of this detailed reference to the facts was to point out the reasonable inference that the "defect" which prevented the normal use for which the car was intended was congenital in origin.
My difficulty is that I can find no proof from the facts in this case that the "defect" in the disc referred to by the witness Gearhart existed when defendant put it in the *202 stream of trade by delivering it to Ford. Gearhart did not so opine, and the facts render that conclusion purely conjectural. As distinguished from the automobile, the lifespan of the grinding disc by reason of the self-destructive abrasive use for which it was designed was extremely short. The testimony was that the utility of each disc was limited to the finishing of five cars. Moreover, as the majority noted, plaintiff himself testified that disintegration of the discs as an end result of use was a commonplace occurrence.
Concededly the disc in question had been used before it came into plaintiff's hands. How much or how often is a matter of speculation, and whether or not such prior use created a defect, or caused it to weaken under the stresses to which it necessarily was subjected is left to conjecture.
Proof of the use history of the disc may be difficult or even impossible to obtain. But this supplies no reason to saddle the manufacturer with liability for a breach of his implied warranty that the disc was suitable for the use for which it was designed. This warranty spoke as of the time the disc was delivered. The burden was on the plaintiff to show either directly or circumstantially a "defect" at that time. I find no such proof, inferentially or otherwise.
Accordingly, I would affirm.