114 N.J. Super. 397 (1971)
276 A.2d 590
JOHN BEXIGA, JR., AN INFANT BY HIS GUARDIAN AD LITEM, JOHN BEXIGA, SR., AND JOHN BEXIGA, SR., INDIVIDUALLY, PLAINTIFFS-APPELLANTS,
v.
HAVIR MANUFACTURING CORP., DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued March 15, 1971.
Decided April 26, 1971.
*399 Before Judges SULLIVAN, COLLESTER and LABRECQUE.
Mr. Robert J. Cardonsky argued the cause for appellants (Messrs. Forman, Forman & Cardonsky, attorneys).
Mr. James F. Norton argued the cause for respondent (Messrs. Lane & Evans, attorneys).
PER CURIAM.
Plaintiffs appeal from an adverse judgment following the granting of defendant's motion for involuntary dismissal at the close of their case.
Plaintiff John Bexiga, Jr. sued for loss of fingers and deformity to his right hand caused by its being struck by the ram of a punch press which he was operating for his employer Regina Corporation (Regina). The action was grounded in negligence, strict liability in tort and breach *400 of warranty of fitness of purpose. His father sued for loss of services and expenses.
The power press in question was manufactured by defendant Havir Manufacturing Corp. (Havir) in 1961 and was sold that same year to J.L. Lucas & Son, Inc. and shipped to Regina, the employer of John Bexiga, Jr. There was no contention that the press malfunctioned because of defective materials, workmanship or inspection. Rather, plaintiffs' theory was that the press, though properly manufactured so far as it went, was so inherently hazardous that the manufacturer was under a duty to protect the ultimate user from the danger posed by it. Reduced to its simplest terms, plaintiffs' basic contention was that the machine should have been equipped at the factory with some form of safety device to guard against or minimize the danger.
Plaintiffs' proofs were to the effect that on June 12, 1966 plaintiff John Bexiga, Jr., an 18-year-old high school junior who had been working evenings for Regina for approximately two months, was directed, for the first time, to work on the machine in question. His supervisor showed him how to operate the machine and then left. He had been operating it for about half an hour when, as he described the accident:
Well, I put the round piece of metal on the die and the metal didn't go right to the place. I was taking my hand off the machine and I noticed that a piece of metal wasn't in place so I went right back to correct it, but at the same time, my foot had gone to the pedal, so I tried to take my hand off and jerk my foot off too and it was too late. My hand had gotten cut on the punch, the ram.
The machine was adaptable to a number of operations but wsa being used at the time solely as a punch press to punch holes in small metal discs. Its essential components were the ram, the die and a foot pedal which actuated a clutch causing the ram to descend with tremendous force (it was rated at ten tons[1]) when the pedal was depressed. In actual *401 operation, when a disc similar to the ones Bexiga was handling would be placed on the die and the pedal depressed, the ram would plunge downward onto the disc four inches below, it would then return to its original position, the finished disc would be automatically blown into an adjoining container, the trimmings would be ejected and the press would be ready for another cycle. The only protective device with which the press was equipped at the factory was a metal guard for the large flywheel.
A mechanical engineer called by plaintiffs testified as an expert that at the time of the accident the press amounted to a "booby trap" because of the absence of a protective device to prevent the ram from descending while the operator's hands were in the work area (point of operation) beneath it. He testified that effective protective devices to guard against the hazard were available and known to the trade, both at the time the press was purchased and at the time of the accident. He described one such device as a pair of push-button controls so spaced as to require the use of both of the operator's hands before the ram could be activated. Another was a guardrail or swing gate (of which there were many variations) to shield the operator's hands from the ram. His testimony would have supported an inference that had the press been equipped with either form of safety device the accident would probably not have happened.
The expert conceded, however, that at the time the press was purchased and up to the time of trial, in accordance with the practice in the trade, presses like the one here involved were not equipped with guardrails at the factory, but it was customary for the ultimate purchaser of the machine to install them. This was because the appropriate type of guardrail or other device to be employed in a given case would depend on the particular use to which the machine was to be put. He opined, nevertheless, that the machine was unsafe as designed and the hazard inherent in its operation required that it be equipped with some form of protective device. *402 He stated that proper design for safety would have been satisfied by the installation of a push-button control (requiring the simultaneous use of both hands of the operator) such as was furnished by the manufacturer on the large presses.[2] He conceded that a large variety of protective devices were available to the purchaser of a press, but averred that in the case of quite a number of machines they were "not gotten eventually because the machine comes without one."
The issue presented is a narrow one. We are not concerned with the general question of whether power presses such as the present one should be equipped with safety devices, but whether the manufacturer could be held liable to plaintiffs, based upon the testimony of plaintiffs' expert and under the theory of negligence or strict liability in tort, for its omission to embody some form of safety device in the power press delivered to Regina.
We are in accord with plaintiffs' contention that conformance with industry standards of construction, manufacture or design, while evidential on the issue of negligence, is of itself not conclusive as to the absence of negligence. Texas & P.R. Co. v. Behymer, 189 U.S. 468, 23 S.Ct. 622, 47 L.Ed. 905 (1903); Wellenheider v. Rader, 49 N.J. 1, 7 (1967); Shafer v. H.B. Thomas Co., 53 N.J. Super. 19, 22-25 (App. Div. 1958). Upon a showing of negligence on its part, defendant could be held liable notwithstanding that its negligence concurred with the negligence of Regina or its employees to permit the machine to be in the dangerous condition which proximately caused the accident. Post v. Manitowoc Eng. Corp., 88 N.J. Super. 199, 204-206 (App. Div. 1965). Plaintiffs' right to recovery did not depend upon the presence of privity between them and defendant. Rosenau v. New Brunswick, 51 N.J. 130, 140-142 (1968); Santor v. A. & M Karagheusian, Inc., 44 N.J. 52, 63 (1965); Jakubowski v. Minnesota Mining and Manufacturing *403 Co., 80 N.J. Super. 184, 192-193 (App. Div. 1963). However, taking as true all evidence supporting plaintiffs' views and giving them the benefit of all legitimate inferences to be drawn therefrom, we are satisfied that they failed to make out a prima facie case under either of the theories cited above.
On the issue of strict liability the pertinent portion of the rule is set forth in the Restatement as
(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property if
(a) the seller is engaged in the business of selling such a product, and
(b) It is expected to and does reach the user or consumer without substantial change in the condition in which it is sold. [Restatement, Torts 2d, § 402A (1965)]
See also Rosenau v. New Brunswick, supra, 51 N.J. at 140-142; Schipper v. Levitt & Sons, Inc., 44 N.J. 70, 90-92 (1965); Santor v. A & M Karagheusian, supra, 44 N.J. at 64-67. From the foregoing it is clear that strict liability presupposes that the assertedly defective product placed in the channels of trade by the manufacturer be expected to and does reach the user or consumer without substantial change in the condition in which it leaves the manufacturer's hands.
Such was not the case here. At the most, plaintiffs' proofs established that Havir sold a specified power press to Lucas, presumably a dealer in machinery, and shipped it to Regina pursuant to the dealer's instructions. There is nothing in the record to support an inference that either Lucas or Regina ordered safety devices installed or even that Havir was in the business of furnishing such devices (the testimony was that they were available from third parties). Assuming that Havir knew that Regina intended to use the press in its manufacturing operations, industry custom directed that the installation of protective devices was the duty of the buyer, hence it had no reason to believe that *404 the press would be put to use without some additions, i.e., the installation by Regina of protective devices suitable to whatever manufacturing process the press was to be devoted. Further, N.J.S.A. 34:6-62, which was in effect at the time of sale but has since been repealed and superseded by N.J.S.A. 34:6A-3, required that a factory owner equip its power presses with proper guards.[3]
By reason of the foregoing it cannot be said that the absence of safety devices amounted to a defect in the machine for which Havir could be held responsible under strict liability principles. Since the machine was designed to perform a number of different manufacturing operations, and the method of affording protection to the operator could differ with each operation, to hold otherwise would be, in effect, to require the supplier of the press to afford protection under all circumstances of use.
The following cases, which involve products intended to be used in the form they leave the manufacturer's hands, are clearly distinguishable. Henningsen v. Bloomfield Motors, Inc., 32 N.J. 358 (1960) (automobiles); Jakubowski v. Minnesota Mining and Manufacturing Co., supra (grinding wheels); Rosenau v. New Brunswick, supra (water meters); Deveny v. Rheem Manufacturing Co., 319 F.2d 124 (2 Cir.1963) (water heaters); Morrow v. Caloric Appliance Corp., 372 S.W.2d 41 (Mo. Sup. Ct. 1963) (gas stoves); B.F. Goodrich Co. v. Hammond, 269 F.2d 501 (10 Cir.1959) (tires); Richey v. Sumoge, 273 F. Supp. 904 (U.S.D.C. Or. 1967) (brush cutters). Compare Schipper v. Levitt & Sons, Inc., supra, (manufacturer held not liable for injury from use of water from boiler which should have been equipped with mixing valve when installed by builder).
On the issue of negligence a manufacturer owes the duty of exercising reasonable care in the design and production *405 of its product to avoid an unreasonable risk of harm from the use thereof by those likely to be exposed to the risk. Jakubowski v. Minnesota Mining and Manufacturing Co., supra; Restatement, Torts 2d §§ 395, 398 (1965). The maker of an article for sale or use by others is required to use reasonable care and skill in designing it so that it is reasonably safe for the purpose for which it is intended as well as for other uses which are foreseeably probable. Jakubowski, supra, 80 N.J. Super. at 191-194. Whether reasonable care has been exercised in a given case depends upon whether there has been a breach of this duty, whether by action or inaction, which had it been observed would have avoided the injury complained of. Brody v. Albert Lifson & Sons, 17 N.J. 383, 389 (1955).
Here the facts to which we have already adverted negate any inference of negligence on defendant's part. The infant plaintiff was injured, not because of any defect in the machine proper, but because safety devices, which the jury could have found should have been furnished to guard against the hazards inherent in all such machines, were not supplied when the machine was placed in operation as part of Regina's manufacturing plant. The basic issue here is whether the jury should have been permitted to determine whether responsibility for the absence of such precautions was chargeable to defendant. Our answer is in the negative.
Viewed realistically, we fail to see how, under the proofs, Havir could reasonably have been expected to do anything more than deliver the press ordered by Lucas to Regina, the latter's customer. Schipper v. Levitt & Sons, Inc., supra, 44 N.J. at 96-99. In the absence of an order from either Lucas or Regina, it was not contractually obliged to install any safety devices. While it is conceivable that it might have refused to deliver the press which Lucas had ordered unless it was also authorized to install safety devices, Regina could undoubtedly have procured an equivalent product from another manufacturer. Further, assuming that an obligation were to be imposed on Havir to install *406 some sort of safety device, what form would it have taken? Obviously, it would have been impracticable to install a safety device that would be adapted to all uses. Since the machine could be used to perform various tasks it conceivably could require a different group of safety devices in connection with each task. It was apparently for this very reason that both the custom in the trade and N.J.S.A. 34:6-62 placed the primary obligation of supplying them upon the factory owner whose employees were to use them. We hold that the imposition of such a duty upon Havir would have been impractical and that it did not act unreasonably in not equipping the press with safety devices "on its own."
Plaintiffs urge that Havir as the manufacturer owed a duty to warn "of latent limitations of the machinery" if the foreseeable user thereof would be ignorant of them, and the manufacturer has no reason to believe the ultimate user will recognize the danger, citing Martin v. Bengue, Inc., 25 N.J. 359 (1957), and Schipper v. Levitt & Sons, Inc., supra. However correct this may be as an abstract statement of the law, it has no application here. The asserted defect in the machine, i.e., the absence of guards or safety devices, was patent rather than latent. Further, their argument that Havir failed in its duty to "give instructions for the proper use of the machinery" and that no such instructions or warnings were inscribed on the machinery is negated by their own expert who testified:
Q Assume now the machine is manufactured as that particular machine was in 1961, assume it was manufactured without safety guards. Now in your opinion, should the manufacturer have recommended to the purchaser a manner in which that particular machine was to be put to use?
A I'm sorry, I don't think so.
There was no duty on the part of Havir to warn that one who inserts his hand in a power press when the ram is descending risks injury, see Prosser, Torts (3d ed. 1964), § 96 at 666-667 or of the obvious fact that there were no safety guards.
*407 Neither Martin v. Bengue nor Schipper v. Levitt & Sons, Inc. is apposite. In the former the product was one which was liable to be ignited under certain conditions, a characteristic of which the user could be totally unaware. In Schipper, again, the defect was a latent one, the boiler having been constructed so as to produce domestic hot water at a temperature far in excess of normal, in the absence of a mixing valve.
For the foregoing reasons we conclude that the motion to dismiss was properly granted. In so doing we are not to be considered as holding that a defect, in order to be actionable, must be a latent one, see Schipper v. Levitt & Sons, Inc., supra, at 84, or that infant plaintiff was guilty of contributory negligence as a matter of law.
Affirmed.
NOTES
[1] Power presses of this (press-rite) type manufactured by Havir were rated at from 2 tons through 85 tons.
[2] The heavier machines apparently would not require that anything be held by the operator.
[3] Rules and regulations governing the safe operation of power presses were promulgated by the Department of Labor and Industry in June 1950. Current rules and regulations are to be found in N.J.A.C. 12:143.